**H.B. MAC, INC., A Kansas Corporation, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 93–79C.

United States Court of Federal Claims.

Nov. 25, 1996.

929 F.2d 679, 682 (Fed.Cir.1991); *National Forge Co. v. United States*, 779 F.2d 665, 668 (Fed.Cir.1985).

William L. Bruckner, San Diego, CA, for plaintiff.

Karen I. Meyer, with whom were Assistant Attorney General Frank W. Hunger, David M. Cohen, and Robert M. Hollis, United States Department of Justice, Washington, D.C., for defendant.

## OPINION

ROBINSON, Judge:

H.B. Mac, Inc. ("plaintiff" or "H.B. Mac"), is a self-certified, small, disadvantaged business ("SDB"). The claim it asserts arises out of a contract for construction of various operational and maintenance facilities at Ft. Shafter, an Army installation in Honolulu, Hawaii. After the contracting officer's denial of plaintiff's claim, H.B. Mac filed a timely complaint in this court under the Contract Disputes Act ("CDA"), 41 U.S.C. § 601 *et seq.* Trial was held in Honolulu, Hawaii during the week commencing September 19, 1994. Over plaintiff's objections, the court granted defendant's two separate motions to amend its answer to assert the affirmative defense of fraud and later to interpose four counterclaims for fraud, arising under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.* as well as the common law remedies of rescission and unjust enrichment. The fraud trial took place in San Diego, CA, during the week commencing May 22, 1994. For the reasons explained fully below, the court has determined that it is necessary to dispose of the issues presented by defendant's First and Second Amended Answers before resolving the issues presented in plaintiff's contract claims suit. Thus, the court subsequently stayed consideration of plaintiff's contract

claim to permit resolution of defendant's fraud claims, since a determination that defendant's fraud claims had merit could result in forfeiture of plaintiff's contract claim. *See* Forfeiture of Fraudulent Claims Act ("FFCA"), 28 U.S.C. § 2514. After concluding the trial of defendant's fraud claims, the court issued a preliminary bench ruling in plaintiff's favor and lifted the stay. Thereafter, the parties submitted post-trial briefs and presented closing arguments in Washington, D.C. on September 20, 1995. After an exhaustive review of the evidence, consideration of said briefs, and hearing of the parties' oral arguments, the court iterates its finding that defendant's counterclaims are without merit. With respect to plaintiff's contract claim, the court finds, in part, for plaintiff for the reasons set forth below.

### Factual Background

On or about July 31, 1991, plaintiff entered into a contract with the Department of the Army ("Army") wherein plaintiff was to perform certain construction work known as the OMS/DS/GS Maintenance Facility ("Maintenance Facility"), and other work (collectively "Project") at Ft. Shafter, Oahu, Hawaii, under Contract No. DACA83–91–C–0029 ("Contract"). The Contract documents required plaintiff *inter alia* to furnish all plant, labor, equipment, appliances, and material, and to perform all work as required to construct a 35,000 square-foot reinforced concrete masonry unit as a motor vehicle repair facility with associated site work and structures, the Maintenance Facility, and a separate wash rack facility. The wash rack facility consisted of a wash rack with mechanical equipment to wash vehicles, one or more concrete slabs, an adjacent sedimentation basin to receive the effluent from the washing operation and to separate solids from liquids, and an oil/water separator consisting of a prefabricated 15,000 gallon steel tank, associated pipes and other equipment. The sedimentation basin and oil/water separator were approximately 130 feet apart. However, the entire wash rack facility, i.e, the washing facilities, the sedimentation basin and the oil/water separator unit, were located about 300 yards from the Maintenance Facility. The Project site lies near the Pacific Ocean and Keehi Lagoon. Both are about 700 yards away from the Project site. Also, various small streams flow through the area, one of which, Kahauki Stream, is located only a short distance away from the Project site but does not actually flow through the Project site. There are also other streams flowing through the area. Groundwater levels at the Project site are affected by those streams, by tidal fluctuations of the Pacific Ocean, and by precipitation.

Ft. Shafter is located on an alluvial plain containing a variety of soils typical of sedimentary soils deposited at various times during the area's geologic development and a mixture of surface soils disturbed to some extent by past construction activity. However, as the court noted during its pretrial site visit, the site contains no significant above ground indications of subsurface soil conditions such as geologic outcroppings. Accordingly, bidders had to rely almost entirely upon Army-supplied soil boring logs for indications of subsurface conditions. The Maintenance Facility is located between the Pacific Ocean and the wash rack facility and, therefore, is closer to the ocean than is the wash rack facility. The entire area varies little in elevation, and groundwater levels throughout the Project site are approximately the same.

Bidders were provided with Contract specifications and drawings, including eight logs of soil borings, all of which were located at or near the Maintenance Facility. One of the borings went to a depth of twenty-four feet. Three of the eight borings showed that the ground water table was at approximately mean sea level ("MSL") or about twelve feet. However, the ground water table could vary upward or downward by as much as two feet, i.e., between ten and fourteen feet below ground surface depending upon tidal fluctuations, nearby stream flows and amounts of local precipitation. The other five borings did not extend to the depth of the water table. The Army provided no other subsurface information to the bidders such as geologic data or soil reports.[1]

1. It is unclear whether the Army retained the actual core samples from these eight borings. If

After reviewing the Contract documents and conducting a routine site visit, H.B. Mac submitted its competitive bid, pursuant to the Army's solicitation for competitive bids. These solicitations went to only small disadvantaged businesses because the procurement was a "set aside."[2] Subsequently, plaintiff, as an SDB, was awarded the Contract in the amount of $6,281,000. The Contract required commencement of the work within seven days after receipt of the Army's notice to proceed ("NTP"), which was issued August 13, 1991 and received August 19, 1991, and completion within five hundred fifty calendar days or on or before February 25, 1993.

By October 17, 1992, H.B. Mac had excavated and completed work on a part of the wash rack including the sedimentation basin. H.B. Mac successfully performed the excavation work for the sedimentation basin using temporary aluminum/wood safety shoring (no sheet pile shoring) to a depth of approximately fourteen feet. H.B. Mac excavated one of two side walls using a vertical cut and the other using a sloped wall method of excavation. The vertical wall maintained its face for approximately three to four months after excavation until construction of a vertical concrete wall was completed notwithstanding rain and other weather conditions which could cause or contribute to wall failure. Only nuisance water was encountered in the sedimentation basin during its construction which was easily removed by a small pump. The subsurface soils H.B. Mac encountered during construction of the sedimentation basin did not vary significantly from those shown in the borings.

On or about October 17, 1992, H.B. Mac began excavation of a pit for the oil/water separator using a three-quarters-to-one ("¾ :1") slope ratio. The Contract documents did not expressly prohibit this type of excavation method. The applicable tank specifications set forth no specific dimensions for the 15,-000 gallon prefabricated steel tank required for the oil/water separator. Thus, the tank's dimensions (length, width, and height) and shape (flat, oval, or round) were solely within the contractor's discretion within the limits of types of prefabricated tanks available from suppliers. H.B. Mac selected a round configuration for the tank, and, based upon its estimate of the diameter and length of a 15,000 gallon prefabricated steel tank, anticipated that the excavation for the tank, including a concrete base upon which the tank was to rest, would not exceed sixteen feet.

During excavation, H.B. Mac encountered a black silty, clay material at approximately the seven foot level. At approximately the thirteen to fourteen foot level while still excavating this same type of material, H.B. Mac encountered ground water, which was in accordance with water levels as shown in the boring logs. At no time during excavation for the oil/water separator, however, did H.B. Mac encounter a thick layer of limestone corresponding to the one depicted in some of the borings.

During excavation, H.B. Mac encountered water problems and had difficulty in maintaining the walls of the excavation. It then proceeded to install temporary aluminum/wood safety shoring in the excavation and to use small pumps in an attempt to dewater the excavation. However, at this point the temporary shoring failed and the sides of the excavation collapsed. This collapse occurred on or about October 17 or 18, 1992. H.B. Mac then attempted to remedy the problem by resloping or laying back the sides of the excavation. The black silty clay material became even more unstable as the

---

it did retain them, the record does not reflect whether the Army allowed plaintiff a reasonable opportunity to inspect these core samples. Nor is it clear whether plaintiff could have discovered any other pertinent subsurface information from such an examination.

2. Defendant alleges that H.B. Mac did not conduct a prebid site visit while plaintiff's evidence indicates that such a site visit was made. On this contested factual point, the court finds that plaintiff conducted such a visit as plaintiff's counsel has unequivocally represented in plaintiff's brief. Access to the site for purposes of a prebid site visit would had to have been granted by the Army. If H.B. Mac conducted no prebid site visit, defendant could easily have shown this fact through contemporaneous Army records, which it did not. In any event, H.B. Mac is charged with knowledge of site conditions that would have been acquired by a reasonable site visit.

dewatering operations continued. Hydrostatic pressure continually forced water into the black silty clay material, contributing to its instability and the failure of the safety shoring, which, unlike sheet pile shoring, is pervious to water. H.B. Mac abandoned its excavation efforts, removed all safety shoring, backfilled the excavation and notified the Army of the problem and its actions with respect thereto.

In October 1992, H.B. Mac provided the Corps of Army Engineers ("Corps") with a sample of the soil from the site.[3] Eric Bjorken, a geologist with the Corps, and Olson Okada, a Corps engineer, examined the soil sample which plaintiff had advised them represented the "unstable and unsuitable soil." From his visual and tactile examination of the soil, Mr. Okada concluded that the sample was a soft gray silty clay, identified as a CL–CH classified soil under the Uniform Soil Classification System, which is generally used in analyzing soils. Based upon their examination of this sample, Messrs. Okada and Bjorken concluded that a sheet-pile shoring and bracing system would be required at the oil/water separator site.

By letter dated October 20, 1992, addressed to Franklin Ono, the Project's Contracting Officer ("CO"), H.B. Mac advised that it believed that the soil conditions at the oil/water separator site constituted a changed condition. This letter also sought direction from the CO respecting future construction efforts. By letter dated November 3, 1992, plaintiff submitted a formal request for an equitable adjustment of the contract price, on the basis of a differing site condition at the oil/water separator site. By letter dated November 3, 1992, the CO denied H.B. Mac's request for an equitable adjustment on the grounds that there was no materially differing site condition at the oil/water separator site and that H.B. Mac should have reasonably anticipated the need for sheet pile shoring when preparing its bid. Accordingly, H.B. Mac was directed to proceed in a safe manner.

Thereafter, H.B. Mac contracted with Construction Labs, a local contractor headquartered in Pearl City, Hawaii, to investigate the site and provide H.B. Mac with its recommendation for completion of the work. As a part of its investigation, Construction Labs drilled two soil borings on November 19, 1992, at the oil/water separator site. These borings were taken after the excavation had been backfilled but before any additional work had been done. Based upon the data it had developed, Construction Labs provided H.B. Mac with a recommended shoring plan using sheet pile shoring.

Plaintiff's expert witness, George F. Moore, later prepared a report, Plaintiff's Exhibit[4] 31, based in part, upon data developed from the two borings. Mr. Moore's report shows that one boring was taken within the edge of the excavation site. This boring was apparently drilled in disturbed soils. Thus, the subsurface data obtained from the first boring is of little value in determining pre-excavation conditions at least to the depth of twenty feet. The other boring was drilled approximately ten to fifteen feet distant from one end of the excavation. The latter boring showed a mixture of coral sandy gravel from one to ten feet but neither boring revealed a thick layer of coral limestone such as was shown in several of the Army-supplied borings. The report states that there was no coral limestone to a depth of thirty six feet, but there was some interbedded silty material, 6″ to 12″ in thickness, at about the twelve foot level, which the report classifies as a soft and unstable clayey silt ("MH") material. Also, according to the report, a thick layer of grey clayey sand ("SC") extended to about twenty feet.[5] The

---

3. The record does not reveal how the sample was taken or from what particular area or areas within the excavation the sample originated. H.B. Mac represents, however, that the soil sample provided to the Army for analysis was the porous, unstable black silty clay material first encountered at the seven foot level. This evidence is unrebutted.

4. Citations to Plaintiff's and Defendant's Exhibits shall hereinafter be cited as "PX" and "DX," respectively.

5. Under the Unified Soils Classification System, an "MH" soil consists of an inorganic silt, micaceous or diatomaceous fine sand or silt including elastic silts and an "SC" soil consists of a clayey sand and sand/clay mixtures of materials.

report is evidence that almost on top of the oil/water separator site, there was a thin lens of the black silty clay material of about the same thickness as the lens discovered by plaintiff during excavation of the sedimentation basin and as shown in some of the eight borings. The report was offered to support plaintiff's contention that the extra thick layer of highly unstable black silty clayey material found at the oil/water separator site and the total absence of a thick layer of coral limestone (as shown by both borings), represented unusual and unknown subsurface conditions which neither party anticipated. The report characterized the coral limestone as "tough" because of a blow count of 65–100 per foot analysis. The report opines that, had the limestone been present, as shown in some of the eight borings, the walls of the sloped excavation would not have failed but would have stood without caving.

H.B. Mac followed Construction Labs' recommended plan and completed the work in accordance with the plans and specifications. All of the work was later accepted by defendant. The installation of the sheet pile shoring at the oil/water separator generated the extra costs above its bid which plaintiff now seeks to recover in this proceeding. By letter dated December 4, 1992, plaintiff claimed additional direct costs "due to the unforeseen, subsurface site conditions" and requested the CO's decision for that amount. This claim was properly certified under the Contract Disputes Act.

Plaintiff, by letter dated March 24, 1993, claimed additional costs which increased the claim to $160,450. Plaintiff's March 29, 1993 letter contained a certification for that amount. However, plaintiff and defendant have agreed that if plaintiff proves its contract claim for the added costs of sheet pile shoring at the oil/water separator site by a preponderance of the evidence, plaintiff is entitled to recover $109,232 in direct costs for a differing site condition and $19,975 for impact and delay costs, excluding interest calculated under the CDA, 41 U.S.C. § 611, and any attorney's fees and costs which might be awarded under the Equal Access To Justice Act ("EAJA"), 28 U.S.C. § 2412. CDA interest will be computed on the direct costs from December 4, 1992 and on impact and delay costs from March 29, 1993, pursuant to the parties' September 19, 1994 Stipulation.

### Procedural History

Plaintiff's suit against the government proceeded to trial in Honolulu, Hawaii on September 19, 1994. At that time, defendant, without any earlier notice to the court, presented its Motion to File an Amended Answer to assert the affirmative defense of fraud to plaintiff's contract claims then pending before this court under the Contract Disputes Act. In support of this motion, defendant informed the court of an ongoing fraud investigation of plaintiff under the direction of the Department of Justice, which had been secretly initiated in April 1994, relating to the Ft. Shafter contract—the basis for plaintiff's claims in this suit. Defendant's counsel further represented that plaintiff's counsel had been orally advised of defendant's proposed motion late on September 16, 1994, the Friday before trial was to commence in Hawaii on Monday. Plaintiff's counsel strenuously opposed the motion on the grounds of prejudice since plaintiff had had no reasonable opportunity to prepare any response to the motion. Defendant's counsel stated that the government's fraud investigation initiated in April 1994 was still ongoing. Thus, plaintiff had been under investigation for approximately seven months prior to trial, with the full knowledge of, if not actually directed by, the Department of Justice's assigned counsel in this case, of which two have been assigned. Although defendant's counsel admitted that plaintiff's counsel had not been informed until late Friday, she maintained this was justified because no final conclusions had been reached regarding whether the government would seek to criminally prosecute plaintiff or its principals for fraud.

Clearly, the court and plaintiff's counsel should have been advised of the ongoing investigation much earlier. Had the court and plaintiff been aware of the government's fraud investigation, which was subsequently concluded without any prosecution of plaintiff or it principals, the court, in consonance with

past practice, would have stayed plaintiff's breach of contract case to allow the government to complete its investigation and subsequently to attempt to resolve any related criminal fraud charges. Such a stay would have been merited because proof of fraud would have shielded defendant from any liability to plaintiff based upon plaintiff's differing site condition claims arising out of the Ft. Shafter contract. In short, had the government proved its fraud charges, in this or some other court, there would have been no need to try plaintiff's contract claims because of applicable forfeiture provisions in the FCA and FFCA. However, considerable judicial resources had already been expended to arrange for the trial, all parties and their counsel were then present in the courtroom, plaintiff's principals and many of its witnesses had already incurred substantial trial preparation costs and travel expenses to attend the trial, and defendant's counsel and agency counsel along with some of defendant's defense witnesses had also incurred substantial pre-trial costs and travel expenses. Therefore, the court delayed ruling upon defendant's motion and proceeded with trial. After trial, despite prejudice to plaintiff, the court ruled, on balance, that defendant's late motion should be granted. Accordingly, defendant was allowed to file its first Amended Answer.

After a site visit, trial of the matter went forward and required five days. The court then stayed the case to allow determination of the fraud issues presented by defendant's First Amended Answer. Subsequently, again over plaintiff's objections on the ground of material prejudice, the court allowed defendant to file a Second Amended Answer, which added common law based counterclaims in fraud.

After trial on the merits of defendant's fraud claims, which took place in San Diego, California during the week commencing May 22, 1995, the court, subject to issuance of this later, more complete Opinion, ruled from the bench in plaintiff's favor on all counts, i.e., that defendant, on the basis of the facts as determined by the court, had failed to prove its fraud claims by the applicable legal standards of proof. That ruling is incorporated herein by reference. Thus, this opinion generally affirms the court's prior bench ruling in plaintiff's favor with respect to defendant's fraud counterclaims, on the grounds previously stated by the court—i.e. defendant's failure of proof. However, based upon the court's subsequent careful review of the entire trial record, the court makes the following additional findings of fact and conclusions of law in further explication of that ruling.

## Contentions of the Parties

### I. The Fraud Claims

#### A. Defendant's Contentions

Defendant argues that applicable SDB regulations required that Connie McManus be in control of the company and that for her to be in control, the regulations, collectively, further require that she be the most highly compensated individual in the business. Defendant contends that during critical periods involving the Contract between plaintiff and the government—at the time of entry into the Contract, during plaintiff's performance of the Contract and at the time of submission of plaintiff's differing site condition claim, that Mrs. McManus was not so compensated (apparently because during such periods her salary, bonuses and other direct monetary payments which she actually received, and with respect to which she paid federal and state income taxes in a given year) totaled less than the comparable payments or entitlements received by the other stockholder-owners during those same times. Therefore, says defendant, ipso facto, she could not have been in control of the company within the meaning of the SDB regulations and that plaintiff's principals actually knew this and intentionally misrepresented plaintiff's status as an SDB or were guilty of fraudulent disregard of the facts regarding plaintiff's lack of qualifications as an SDB.

Defendant further contends that the term "retained earnings" as used in the SDB regulations, 13 C.F.R. § 124.103(e)(3), is not a criterion for determining control as set forth at 13 C.F.R. § 124.104, but pertains only to ownership of the business, which defendant says is undisputed. That is, Mrs. McManus is the legal owner of the business since she unquestionably owns 80% of the stock of the

company. Defendant admits, however, that the term "compensation," as used in that section, does relate to control.

Although Mrs. McManus kept some of her compensation in retained earnings, allegedly in order to increase the company's bonding capacity, defendant argues that plaintiff cannot consider any such funds as compensation to her in comparing the relative amounts received as compensation by the company's officers. Thus, says defendant, it is entitled to a ruling in its favor on its four fraud counterclaims in that it has met its burden of proof of showing, by a preponderance of the evidence, that plaintiff's claim involving the Ft. Shafter contract was submitted in violation of the FCA and FFCA and, further, that it has met its burden of proof of showing, by clear and convincing evidence, that its counterclaim in common law fraud should be granted. Consequently, pursuant to its counterclaims, defendant seeks the following: damages in an amount to be determined by the court, subject to trebling, plus interest thereon until paid; statutory penalties in the amount of $10,000 for each claim or invoice for payment submitted and for each false statement made to the United States; rescission and restitution; the costs associated with prosecuting this counterclaim; and such other relief the court deems just and proper.

### B. Plaintiff's Contentions

Plaintiff counters that its evidence shows that when plaintiff reorganized the company to qualify as an SDB, it attempted, in good faith, to comply with all applicable SBA/SDB regulations governing its status, that it hired competent counsel to advise it respecting such compliance, that it followed the advice of that counsel in connection with its establishment and its subsequent operations, that at no time did that counsel advise them that there was any regulatory requirement that Mrs. McManus' salary, bonuses and other direct compensation, however defined, had to exceed that of the other, nondisadvantaged, company officers for any defined period of time, that all company officers, including Mrs. McManus, believed, in good faith, that Mrs. McManus, after acquiring 80% of the stock in the company, and being elected pres-

ident, was in control of the business to the extent required by the SDB regulations and could make all policy and management decisions including a determination of who could serve on the company's board of directors, what contracts would be bid by the company and what operational duties would be assigned to the other company officers.

Plaintiff further contends that all of the evidence upon which defendant relies to show that Mrs. McManus was not in control of the business during the critical times of entry into and performance of the Ft. Shafter contract and the submission of plaintiff's monetary claim arising out of that contract, collectively considered, was based upon unfounded suspicions as was proven by plaintiff's countervailing, explanatory evidence and that no finding of her lack of control, within the meaning of any reasonable and fair reading of the regulations, is justified. Alternatively, plaintiff maintains that even if the regulations are being now correctly interpreted by defendant, as stated by Mr. Sinha, defendant's expert witness, such an exceedingly narrow interpretation was entirely subjective in nature and personal to Mr. Sinha, i.e., it was not made known by the SBA in any published literature available to self-certifying SDBs or to counsel for such SDBs. Thus, plaintiff says that it had no advance opportunity to know the after-the-fact interpretations of the government and Mr. Sinha and, thus, to arrange payment of sufficient compensation to Mrs. McManus to accord with that interpretation. Finally, plaintiff avers that its status withstood prior examination by auditors in connection with protests by competing SDBs, one of which involved the Ft. Shafter contract, and that no finding of noncompliance by any agency, including the SBA, resulted from those protests. The withdrawal of these protests, plaintiff says, reassured it that it was properly qualified as an SDB and, thus, correctly interpreting the SDB regulations respecting its status. In this regard, also, plaintiff states that its evidence shows convincingly that all of its principals, as well as plaintiff's corporate counsel, believed in good faith that plaintiff was in full compliance with applicable SDB regulations at all times. Moreover, plaintiff points out that had any of plaintiff's principals or its

counsel thought that there was any question about Mrs. McManus' control of the business, it would have been a simple matter for Mrs. McManus, at any time, to have voted herself an increase in her total compensation, as defined by Mr. Sinha, to assure that she received more than the other officers in the company and to have made other changes in the company's operations to the extent necessary to remove any doubt about her status. Therefore, plaintiff says that it is not guilty of any fraud under either the False Claims Act, the Forfeiture of Fraudulent Claims Act, or defendant's common law fraud counterclaim and it is entitled to have the court consider its differing site condition claim on it merits.

## II. *The Contract Claim*

### A. Plaintiff's Contentions

Plaintiff contends that the black silty clay material, first encountered at the seven foot level during excavation of the oil/water separator site combined with an "unusual amount of water" at the thirteen-fourteen foot level caused soil instability leading to the "cave-in" and failure of the temporary aluminum safety shoring and the need for subsequent installation of sheet pile shoring. Thus, it contends that this soil and water combination constituted a Type I Differing Site Condition described in FAR Clause 52.236-2(a) which states that the contractor must notify the CO of "subsurface or latent physical conditions at the site which differ from those indicated in the contract." Further, plaintiff argues that such conditions were materially different from those indicated in the Contract documents or could be implied from other language in those documents and, as a consequence, it had to install sheet pile shoring at a significantly greater cost than the aluminum safety shoring upon which its bid was based and it had attempted to install. Wherefore, H.B. Mac, after amending its complaint, claimed entitlement to $160,450 in

damages, interest, attorney's fees, costs, and any other relief the court deems appropriate.

Plaintiff avers that it has shown by a preponderance of the evidence all of the necessary elements to prove a Type I differing site condition claim as stated in legal precedents binding upon this court. More particularly, plaintiff says: that the Army's boring logs were intended to and did represent conditions at the site notwithstanding the fact that they were taken approximately 300 yards distant from both the sedimentation basin and the oil/water separator site; that it reasonably relied upon the Army's eight soil boring logs, the only subsurface data supplied by the Army, as affirmative indications of subsurface conditions; that the reasonableness of its reliance is supported by internal Army documents essentially admitting plaintiff's reliance was reasonable in the absence of other data; and that relying upon these same borings, it successfully excavated for and constructed the sedimentation basin, which at one end was approximately thirteen feet deep and was only one hundred thirty feet from the oil/water separator, using only safety shoring, a vertical cut for one wall, which went to a depth of thirteen feet, and a small water pump to remove accumulated rain water.[6]

Plaintiff also contends that it reasonably chose the sloped-wall method of excavation and use of only safety shoring at the oil/water separator site because some borings showed a substantial subsurface limestone layer reaching in some instances to a depth of sixteen feet, which would have prevented installation of sheet pile shoring (such shoring cannot be driven through tough limestone). In essence, plaintiff says that limestone, had it been present, would have required removal before any type of sheet pile shoring could have been used. However, if present, such limestone, because of its rigidity, would have provided support for the walls of the excavation and allowed for a more vertical cut than other-

---

6. The Army's final soil investigation report ("SIR") written in preparation for advertising the Project for bids, indicated that no further borings were needed since the previous borings done January 14–19, 1988, and laboratory testing, "provided sufficient design data." Thus, plaintiff says that this evidence also supports its contention as to the reasonableness of its reliance in that the Army, as did plaintiff, anticipated that the soils throughout the construction site would be the same or similar to those indicated in the borings.

wise would have been the case. Accordingly, plaintiff maintains that it reasonably did not anticipate the need for sheet pile shoring to the anticipated depth of sixteen feet and that, in accordance with its plan, safety shoring would have been adequate for up to six feet below the limestone. Plaintiff says that, based upon the indicated presence of a substantial layer of rigid limestone coupled with the lack of an indication of a substantial layer of black silty clay material, it reasonably believed safety shoring would be adequate even though excavation below sixteen feet might be required.

H.B. Mac argues, further, that although there was a layer or lens of clayey silt shown in boring B–13 at the four to six foot level, it was not unreasonable for it to not have anticipated the much thicker layer of this type of material at the oil/water separator site. As proof of this fact, plaintiff points to the fact that the lens of silty/clayey material did not prevent a vertical excavation of one wall of the sedimentation basin to a depth of approximately thirteen feet and a drainage ditch to a depth of approximately twenty feet. Also, it maintains that the bucket of black silty/clayey material, which it took from the oil/water separator site and gave to the Army for analysis, was classified by the Army as a silty/gravel/sand/clay material, i.e., a CL–CH classification, a soil type not shown on any of the borings. Plaintiff says that in the absence of borings at the oil/water separator site, it could not have reasonably foreseen the need for sheet pile shoring.[7]

Finally, plaintiff alleges that its costs of installing the sheet pile shoring due to the materially different subsurface conditions were extra costs and, based upon the Army's audit, those costs total $129,207 as stipulated to by the parties not including CDA interest computed thereon and attorney's fees which may be recoverable under the Equal Access To Justice Act.

**B. Defendant's Contentions**

Defendant responds that plaintiff has failed to establish by a preponderance of the evidence any of the requirements for a Type I Differing Site Condition claim—namely: (1) contract indications; (2) actual conditions; (3) reliance; and (4) damages. Defendant, in its brief, relies upon many of the same legal precedents cited by plaintiff in its brief. Specifically, defendant alleges that because the soil borings were approximately three hundred yards distant from the oil/water separator site, the Contract documents were not intended to and did not represent subsurface conditions at that site but only informed as to conditions at the Maintenance Facility. The government says the borings were provided only to assist bidders and constituted potentially helpful information of a general nature. Defendant argues that only three of the borings went to a depth of about 20 feet, the approximate ultimate depth of the oil/water separator, thus showing that defendant didn't intend the borings to represent subsurface conditions across the entire site. Defendant argues, further in this regard, that the Contract contains paragraph H. 17, referring to FAR 52.236–4, Physical Data (April 1984), which relieves defendant of responsibility for the accuracy of the data that it provides and is another clear indication of a lack of intent for the borings to represent subsurface conditions at the oil/water separator site.[8]

Next, defendant asserts that because of plaintiff's lack of knowledge of local conditions and lack of engineering experience, it misread or misinterpreted certain of the Contract documents and placed undue reliance upon the borings. It says these were errors in judgment for which plaintiff is solely responsible. First, defendant submits

---

7. Plaintiff also argues that if defendant accepts that plaintiff reasonably relied upon the borings in the absence of other subsurface data, because they show highly variable subsurface soil conditions, the Army must have known that the borings might not accurately represent subsurface conditions at other site locations. Therefore, plaintiff says the Army should have supplied additional borings at the actual location of the oil/water separator site.

8. That paragraph provides, in part, that: "Data and Information furnished or referred to below is for the Contractor's information. The Government shall not be responsible for any interpretation of or conclusion drawn from the data or information by the Contractor."

plaintiff was not reasonably prudent in its extrapolation of the borings to a site three hundred yards distant. Next, defendant says that plaintiff, in sloping the walls of the excavation, made another critical mistake in its interpretation of the Contract documents, which defendant attributed to its lack of expertise and local knowledge. Specifically, defendant says plaintiff misread an unscaled mechanical contract drawing, M–6, showing sloped lines extending upward from the bottom of the excavation. Also, defendant argues that plaintiff failed to properly calculate the depth of the tank it installed. In this regard, defendant says that detail 4 in M–6 omitted any dimensions because it applied to two oil/water separator tanks, one 500 gallon tank for the Maintenance Facility and the 15,000 gallon tank for the oil/water separator. Thus, defendant maintains that the Contract documents placed sole responsibility upon H.B. Mac for selecting the proper shapes, dimensions and depths of these two tanks and, consequently, for determining exactly how deep it must excavate for proper placement of the oil/water separator tank. It says that, as a consequence, H.B. Mac erroneously concluded that the tank at the oil/water separator would be six or seven feet in diameter and could be installed with only a sixteen foot excavation depth when in fact the prefabricated steel tank it ultimately selected and installed was about 9 feet in diameter and required a twenty foot deep excavation. Defendant contends that plaintiff also erred in choosing to slope the excavation, by using blow counts which is simply a method for measuring a soil's density not its cohesiveness. Defendant maintains that sands and gravels are cohesionless and excavations in such materials should not be sloped back. Defendant says that only two soil borings, 6 and 13, show an MH designation (under the uniform soil classification system) which indicates a silt but that an "open cut" would be possible only if the MH deposit was continuous which the borings showed was not the case. Thus, defendant concludes that H.B. Mac's reliance upon the blow counts and the limited presence of MH soils as shown in these two borings did not justify choice of a sloped-wall excavation rather than use of vertically installed sheet pile shoring.

Further, defendant says plaintiff misjudged water levels at the site by not understanding the significance of: (1) the showing on the borings of MSL, which was at about 10 feet below surface elevation at the site; (2) the close proximity of the Pacific Ocean and a lagoon to the site; (3) the presence of increasing hydrostatic water pressures in the excavation as work proceeded; and (4) that the soils at the site, shown in the borings as being cohesionless sand, gravel and "vuggy," or porous, limestone, would be unstable when saturated by ground water.[9]

Further, defendant argues that any reliance plaintiff may have placed upon Section 02201, "Excavation, Filling and Backfilling for Buildings," which in paragraphs 2.1 and 2.2 define certain soil classifications as either "satisfactory" or "unsatisfactory," to give it "general direction" as to the nature of the soils which might be encountered in the excavation, was misplaced because these designations relate only to proper soils for backfilling for foundation purposes and not to the strength or cohesiveness of the soils.[10]

Defendant accuses plaintiff of not having investigated, in a proper prebid site visit, other local conditions including the presence within the area of fresh water streams, highly variable alluvial soils deposited by such streams and the effect of this upon the various soils found at the site. Defendant again charges plaintiff with placing unreasonable reliance upon the borings because they were not contiguous to the site and because plaintiff was unaware of all the particularities and peculiarities of this site, which defendant asserts an experienced contractor on Hawaiian

9. Defendant alleges that when the water pressure became so great in the bottom of the pit, which theoretically amounted to approximately 2,500 pounds per board in the bottom of a 20 foot excavation at the site or 875 pounds per square foot, this hydrostatic pressure caused a lifting of the soil, a "caving-in" of the excavation's walls and a failure of the safety shoring which presented no physical barrier to the incursion of water.

10. Since plaintiff places no reliance upon this provision in the Contract, we need not consider this contention.

projects would have known and accounted for in its bid.

Defendant alternatively contends that even if the borings are regarded as representative of all Project site conditions, such conditions would have warned a reasonably prudent contractor of the porous, unstable subsurface soils actually encountered. Respecting the 5 gallon bucket of material plaintiff collected and Army representatives Olson Okada and Eric Bjorken later analyzed, which defendant now says the Army misidentified as CL–CH, or silty clay, defendant contends that, in retrospect, the proper classification for the sample should have been SC or a clay/sand which was shown in the borings. Further, defendant says the two borings taken by George Moore, plaintiff's engineer who designed the sheet pile shoring later installed, revealed no CL–CH which defendant says supports its argument that no silty clay was present at the site, which might have offered more support for the walls of the excavation. Thus, defendant says the actual subsurface conditions (porous, unstable saturated soils) encountered at the oil/water separator site were reasonably foreseeable to an experienced contractor based upon indications in the boring logs and should have caused plaintiff to anticipate the use of sheet pile shoring.

In sum, defendant contends that plaintiff's excess costs were not solely attributable to materially different subsurface conditions at the site but to the foregoing miscalculations, including its failure to investigate local conditions, which led plaintiff to unreasonably base its cost estimate for excavation of the oil/water separator upon installation of the less expensive safety shoring rather than the more expensive sheet pile shoring. It argues, alternatively, that the subsurface conditions actually encountered did not differ materially from the conditions indicated in the borings and that such conditions were reasonably foreseeable from the soil borings. Finally, it says that plaintiff's excess costs were not solely attributable to the purported materially different subsurface conditions at the site. For these reasons, defendant dis-

putes that plaintiff has proven by a preponderance of the evidence the elements of a Type I differing site condition claim.

### DISCUSSION

#### I. The Fraud Claims

Richard McManus and Gary Harden formed H.B. Mac as a Kansas corporation on May 6, 1983, to perform general construction work. At that time they each owned fifty percent of all of the corporate stock in the company. Mr. McManus was president and Mr. Harden was vice president. Connie McManus, Mr. McManus' wife, served as Corporate Secretary but owned no interest in the company. In 1985 and 1986, an office building was constructed in Overland Park, Kansas. Messrs. McManus and Harden formed a partnership, Boulevard Associates, to jointly own this office building. Thereafter, the partnership acquired title to the building, financing the purchase of it with a mortgage to College Boulevard National Bank, Overland Park, Kansas, for the sole purpose of leasing the building to H.B. Mac, Inc. Messrs. McManus and Harden agreed to pay themselves bonuses to fund the lease payments in view of their personal guarantees of the mortgage payments to the Bank, a requirement of the surety company involved. They independently paid taxes on these amounts although such amounts were never actually received by them.[11] Once the office building was available for occupancy, sometime in 1986, H.B. Mac moved its corporate headquarters into this building. However, by May 1988 the company had moved its headquarters to San Diego, California in order to expand its operations and take advantage of less restrictive bonding requirements.

In 1988, in order to better compete in their market area, H.B. Mac concluded that it should attempt to qualify as an SDB under Small Business Administration ("SBA") regulations which would give it a desirable competitive preference in bidding on projects set aside for such businesses. Therefore, the company's officers met at the company's headquarters in San Diego, California, with

11. Thus, after the company's reorganization, Mrs. McManus was contributing indirectly to Boulevard Associates because the funds used to pay the lease payments were being paid out of the company's retained earnings in which she had an interest as 80% owner of the company.

Thomas M. Moore, an attorney from Kansas City, Missouri and the company's corporate counsel, about reorganization of the company to allow it to qualify properly as an SDB. After studying the applicable regulations, Mr. Moore advised the company's officers at this meeting that in his opinion the company could be reorganized to fully qualify as an SDB because of Connie McManus' minority status (her ancestry is ¼th Native American) but that after reorganization she would have to own a majority of the voting stock of the company and actually control the business.

Also, at that meeting with Mr. Moore, and later by phone, they collectively discussed how the stock in the business would be divided among the principals so that Mrs. Mc-Manus, after the reorganization, would actually control the business. (R. 645–646.) The plan suggested by Mr. Moore was for Mrs. McManus to have transferred to her from Messrs. McManus and Harden sufficient shares to give her 80% of all of the voting stock in the company which would leave them each with only 10% of such stock. Under this arrangement, all of the owners understood and agreed that Mrs. McManus would have control of the business because she would have the power to elect all of the members of the company's board of directors. The reorganization was completed as planned.[12]

During the meeting in San Diego, California, Mr. Moore informed all of the company's principals, including Mrs. McManus that, in his opinion, "control," as used in the SDB regulations, meant that Mrs. McManus' level of compensation had to be "reasonable," that she was not required to be physically present in her office 40 hours per week so long as she knew what was going on, that she could and should delegate operational matters to others, based upon their qualifications, and that she did not need to change company policies to exercise control over the company. However, at no time, whether during the meeting in San Diego, or thereafter, did Mr. Moore, instruct the officers of H.B. Mac, including

Mrs. McManus, in any greater detail with respect to his interpretation of the SDB regulations' requirement that she must exercise "control" of the business. Thus, at no time did he advise any of the corporate officers that Mrs. McManus' actions in exercising "control" must encompass specific operational matters such as: (1) her physical presence each business day at the company's corporate offices; (2) her observance of some minimum number of office hours on those days when she was present; (3) her occupancy of an office of a particular size in relation to the offices of the other officers; (4) her personal attendance of all formal Board of Director's meetings; (5) her signature on the minutes of all corporate meetings; (6) her salary level in comparison with that received by all other officers during some defined period of time; (7) her personal knowledge of and participation in day-to-day operations of the business relating to marketing plans, bidding and performance of construction contracts, locations of all projects under contract and accounting, tax, and banking matters; or (8) her need for development of additional technical skills such as those possessed by her departmental managers.

Mr. McManus never studied or scrutinized the regulations although he did admit to looking at them. The SDB regulations had just been adopted at the time of the company's reorganization and Mr. McManus said he knew of no instructional pamphlets issued by the SBA or any other agency, which provided guidance as to the meaning of the SDB regulations. It is undisputed that at no time have companies wishing to qualify as SDBs been given instructional materials or written guidelines to help them interpret these regulations. Neither Mr. Harden nor Mrs. McManus read the governing regulations. In fact, as their unrebutted testimony shows, all three officers of the company relied completely upon the advice of counsel, Mr. Moore, as to the meaning of the SDB regulations and the actions the company must take to comply therewith. Again, fol-

12. In the 1988 reorganization, Mrs. McManus purchased 1440 shares for $1.00 per share which had a value of approximately $469,433.60. This left Messrs. McManus and Hardin with negative retained earnings of approximately $233,276.00 each or sizeable starting net losses in 1988, which, based upon the success of the company's operations, they contemplated recapturing, in part, through future payments to them of larger bonuses than Mrs. McManus would be paid.

lowing Mr. Moore's advice, which they regarded as experienced and competent, they made no effort to adopt different corporate by-laws or change the company's operating practices but continued to use the same by-laws and practices that were in place and had been followed successfully since the company's incorporation in Kansas in 1983.

Mr. Moore's testimony completely confirmed plaintiff's officer's testimony as to the circumstances surrounding the establishment in 1988 of plaintiff as an SDB. Mr. Moore, who has engaged in the active practice of law in Missouri since 1971, has specialized in construction contract practice with an emphasis upon government contracts. Mr. Moore said that plaintiff's principals believed, and continue to believe in good faith that as a result of the company's reorganization, which he effected, H.B. Mac was in compliance with SDB regulations and was operating as a qualified SDB at all times. Mr. Moore also confirmed the fact that during his preliminary discussions with Mr. and Mrs. McManus, they made it clear that they did not want to go forward with restructuring the company as an SDB unless the new company could operate in full compliance with the regulations and not simply as a "front." Further, he stated that the owners wanted very accurate and precise answers regarding the company's ability to legitimately qualify and operate as an SDB under the applicable regulations with Mrs. McManus running the company. (R. 849.) Mr. Moore's perception, from his discussions with Mrs. McManus was that she could manage the business—i.e. she had sufficient managerial experience to comply with regulatory requirements and exercise operational control. Accordingly, he advised that Mrs. McManus was not required to be physically present in her office 40 hours per week and that, so long as she "knew what was going on," she could and should delegate operational duties to others. In Mr. Moore's opinion, under applicable corporate law, her ownership of 80% of the stock gave her unquestionable control of the company. Therefore, under the reorganization, his opinion was that Mrs. McManus would be responsible for H.B. Mac's business decisions and that she had a free hand to run the business with no special duties to be per-

formed as president. Finally, based upon later phone conversations he had with Mrs. McManus, he testified that he felt Mrs. McManus was actually running the company and that her testimony on deposition which he had read, taken as a whole, confirmed this opinion.

Moreover, Mr. Moore saw no problem in the fact that Mrs. McManus had only one vote on a three person board of directors because, as a matter of corporate governance, she still had the power to change the membership of the company's board of directors. Therefore, if at any time after the reorganization, some member of the company's Board disagreed with her and opposed her wishes, she would have the power to remove that member and elect a replacement. In fact, he said Mrs. McManus, as 80% owner, could have caused the company to cease to do business, dissolve and liquidate and thereby have received 80% of the assets, if any, of the business. Further, Mr. Moore was of the opinion that the regulations did not require that she change successful company policies or procedures simply to evidence her control once she had it. (R. 861.)

During the reorganization, Mr. Moore read the applicable SDB regulations. He did not seek out the SBA's guidance as to how they should be interpreted. However, as he explained, had he tried, there would not have been anyone available to provide a binding interpretation of the meaning of the terms "compensation" and "retained earnings" as used in the regulations. (R. 873.) It was and is Mr. Moore's opinion that the SDB regulations do not require that the person owning a majority of stock of a business have a certain level of training and technical expertise so long as control is present, (R. 881), nor do they require that such person personally know certain operational details of the business such as bonding requirements for federal projects, subcontractors' names, information in project site reports, the amounts of loan payments to other companies, or contractor licensing requirements in California. (R. 898–899.) Accordingly, Mr. Moore did not advise the principals of H.B. Mac at the organizational meeting, that SDB regulations required that, as president, Mrs.

McManus evidence her control of the business by being physically present each business day, or that she had to be present during established office hours at the company's headquarters, or that she had to personally attend every board of directors' meeting, or that she had to sign every corporate minute of every board of directors meeting.[13]

After the reorganization meeting in California, Mr. Harden met separately with Mr. Moore in his Kansas City, Missouri office. At that time Mr. Moore again explained to Mr. Harden that by his transfer of shares of stock to Mrs. McManus, he was, along with Mr. McManus, giving up control of the business to Mrs. McManus. Mr. Harden understood this advice and went forward with the plan for reorganization notwithstanding the requirement that Mrs. McManus have actual control of the company.

The business was being profitably operated at the time Mrs. McManus acquired control in 1988. At that time she made no material or major changes in the company's business plan or its operations. But, in her view, there was no reason for her to do so as long as the business was successful. Unquestionably, the power to make such changes was in her hands due to her ownership of 80% of the company's stock. By 1991, the retained earnings of the company had increased to $1,097,023.00 of which, in liquidation, Mrs. McManus could have received 80% after payment of all company indebtedness and the costs of liquidation. (R. 697.)

After reorganization Messrs. Harden and Fisher, the latter a key employee of the company, prepared most of the project estimates. After achieving SDB status, the company initially was awarded only five SDB contracts or approximately 28% of all of its projects. Although the company bid on many projects as an SDB, only sixteen of these bids actually resulted in awards of government construction contracts to the company. The company's bids usually included an allowance of 5% to 15% for profit.

Direct supervision of all SDB work was divided between Messrs. McManus and Harden. If Mr. McManus prepared the bid for a project, he usually supervised that project thereafter. (R. 665.) Suspensions of work, delays, issuances of change orders and the like did not require special attention of the president or the board of directors but were treated as ordinary occurrences on construction projects. The handling of hazardous waste was not an issue for the company initially, but since the 1990's, it became an issue and required managerial expertise. (R. 666–667.)

At least twice other SDB contractors protested awards of contracts to plaintiff. One of these protests involved the Ft. Shafter contract. As a result, H.B. Mac provided documents in support of its status as an SDB which resulted in a withdrawal of these protests. The documents related to proof of Mrs. McManus ownership of a majority of the stock in the company and of her Creek Native American heritage. Mr. McManus tried to find out about one of the two protests by calling the San Diego, California office of the SDB about how to respond to the protest but received a voice-mail response and, therefore, never spoke to a person who could answer his questions. Plaintiff's evidence shows that, at all times Mr. McManus relied upon the advice of Mr. Moore, plaintiff's corporate counsel, and believed, in good faith, that the company was in compliance with SDB requirements but his attitude was that you "want to make sure of this." (R. 737.) Also, Mr. Harden's unrebutted testimony shows that he also relied upon Mr. Moore's counsel in this regard and similarly believed that, at all times during its operations, the company was in compliance with the SDB regulations respecting its status. (R. 906–911.) During his testimony he also referred to the two protests which were withdrawn after the company supplied information regarding Mrs. McManus' Native American heritage, which permitted the subsequent award of the two contracts at issue.

---

13. According to Mr. McManus, Mrs. McManus attended every Board meeting since she was elected President, came to her office an average of three days each week, no one "assigned" her an office because she chose her own office, (R. 653), she operated her own computer and her office was never used simply as a storeroom.

Admittedly, the company's officers did not at all times receive the highest wages paid to employees. For example, Oscar Villafranca, a superintendent, was paid a higher amount than a company officer at one time. Also, on occasion, because electricians and carpenters under the requirements of the Davis Bacon Act had to be paid between $34 and $35 per hour in Hawaii, the company officers made less, at least in wages, than did such hourly paid employees for a brief span of time. Further, it would have been totally unreasonable according to plaintiff to have expected Mrs. McManus to know technical aspects of the company's business. For example, as Mr. McManus testified, no one in the company understood how to set up a critical path method for more efficient performance of a contract. Therefore, such specialized work, also called a "bar chart" development or "network analysis," was always subcontracted out to qualified parties when required by particular projects.

Plaintiff's bookkeeper since 1983, Betty Jo Knoche, always handled the company's payroll, tax returns, check books, financial statements, general ledger accounts, purchase journal entries and similar corporate records. She testified that bonuses were not always paid by check but paid, in part, through reimbursement of expenses charged to a numbered account which practice made it difficult to determine actual comparative compensation levels for the three officers of the company. This difficulty was exacerbated because of the unusual arrangement for payment of personal credit card expenses and payment of charges to Boulevard Associates, the above described partnership of Messrs. McManus and Harden in which Mrs. McManus had no direct interest. Further, such a determination was difficult because the company's ledger did not reflect all bonus payments to Mrs. McManus. Ms. Knoche said it was easier from an accounting standpoint to simply show both bonuses due Mr. and Mrs. McManus under Mr. McManus' initials and later issue payments separately to them as orally instructed.

Defendant's auditors performed several audits at various times of plaintiff's business records. Paul D. Markeiwicz, a senior audi-tor within the Defense Contract Audit Agency ("DCAA"), performed two audits of H.B. Mac's records, one in January 1992 and another in May 1992. Mr. Markiewicz had no prior experience in auditing any company for compliance with SDB requirements and was unfamiliar with the SDB regulations. During the second audit, everything was examined including bonuses, salaries, expense accounts, travel, profit sharing and the like. The auditors began a third audit, (R. 745–746), while the first and second audits were both still in progress. This third audit was performed after the elapse of two years from the first audit's commencement and eighteen months after the second audit's commencement. None of these audits resulted in any parallel criticism of plaintiff's SDB status. In fact, according to plaintiff's unrebutted testimony, the third audit resulted only in the auditor expressing the opinion that all was in order but that the company needed to invest its profit sharing funds in more speculative investments to increase the return to its beneficiaries, an unusual criticism for an auditor. After one of the audits, an objection was made to the manner in which overhead was accrued to specific projects (which resulted in a minor change in operations). No objection was ever made, however, during any of these three audits of H.B. Mac's SDB status based on any underpayment or under-accrual of salary or other forms of compensation to Mrs. McManus compared to any other officer's payments or accruals.

Mr. Markeiwicz did not see Mrs. McManus in her office during the brief periods he was present in plaintiff's offices for purpose of his audits. From this fact alone apparently, he concluded she was not at work on company business. However, he made no inquiry of anyone as to where she was or what work she was doing on those days or times when he failed to see her in her office. He failed to consider whether Mrs. McManus, at the unidentified times he looked into her office, was simply in some other office or conference room within the building or simply temporarily outside her office for any number of valid reasons including reasons related to performance of her duties as president. Mr. Markeiwicz also concluded, in part from his examination of plaintiff's payroll records dur-

ing his audits, that Mr. and Mrs. McManus' salaries, were equal or approximately equal to the total salary paid to Mr. Harden for the years 1990 and 1991. He said that Mr. Harden had "an agreement" to share equally with Mr and Mrs. McManus in the profits of the company. However, Mr. Markeiwicz made no inquiry about the term of such an agreement or whether it applied only to salary or to all forms of compensation. (R. 451–453.) Plaintiff's evidence convincingly establishes that when Mr. Markeiwicz performed his audits, he never told anyone at H.B. Mac that he had any concern about that company's status as an SDB because of comparative levels of compensation or salaries of the officers.

On March 23, 1994, the DCAA sent John Curtes Dyer to plaintiff's offices to perform an entrance conference with H.B. Mac personnel. Mr. Dyer's familiarity with corporations came from his education and reading of the WALL STREET JOURNAL. Based upon his findings, he suspected that the company was not a qualified SDB principally, because: (1) Mrs. McManus' office appeared to be smaller than those of the other officers, although he took no measurements to accurately compare office sizes; (2) he never saw Mrs. McManus actually in her office, although he did not inquire as to whether she was actually in the office building or in another office; (3) he saw an unidentified number of cardboard cartons of various sizes in her office, which he interpreted as being stored there, but he made no effort to determine their contents, the reason for their presence in her office, or how long they had been placed there; and (4) Mr. Harden, in his presence, had some difficulty in accessing Mrs. McManus' computer, although he was told at the time that an access password was needed, which Mr. Harden did not then have. Apparently, these events were so highly suspicious in his view that they led him to examine DCAA's permanent file and thereby conclude without any study of the applicable regulations that Mrs. McManus was receiving significantly less remuneration than the two vice-presidents. (R. 60.)

He then reviewed minutes of meetings of the board of directors which were openly and freely given to him for his review.[14] He found some Board meeting minutes that were not executed by Mrs. McManus which, in his view, involved a major contract matter—i.e. whether the company would adopt a particular marketing strategy to obtain certain contracts. Although no dollar amounts were revealed in the minutes, he concluded, without any experience as a contractor himself or knowledge of pertinent California corporate law, that Mrs. McManus should have signed such important minutes if she were truly in control of the company. However, he made no effort whatever to determine whether she actually had participated in the meetings represented by the unsigned minutes and had simply inadvertently failed to execute the minutes. He never considered the possibility of there being some other plausible and entirely rational reason for the unsigned minutes being in the company's minutes book. Further, he failed to consider whether Mrs. McManus may have informally discussed the company's marketing strategy with Mr. McManus and Mr. Harden prior to the meeting and had, therefore, participated in the decision making process involving such strategy as fully as if she had been present at the meeting. He asked no questions of any one about his suspicions regarding the few minutes not signed by Mrs. McManus because he thought he was prohibited from doing so if he suspected fraud. (R. 101.)

At the time of his referral, Mr. Dyer had only read 13 C.F.R. § 124 but had no personal knowledge of any SDB or DCAA interpretive rulings or specific requirements regarding salaries, bonuses, or other components of total compensation which might be legitimately compared for some period of time to determine the highest paid officer of an SDB. (R. 97.) During his testimony Mr. Dyer cited to no regulation or past interpretation of a regulation that supported his fraud referral—only his "suspicions." (R. 99.) In fact, DCAA had, in the past, performed an audit of plaintiff's records which included all

---

14. Apparently, Mr. Dyer returned to H.B. Mac for the sole purpose of examining Board minutes because he said that he suspected fraud in that

Mrs. McManus' salary level on March 23, 1994, in comparison to the other officers was "too low." (R. 961.)

of the same corporate information on salary and bonuses. The past audit did not result in a referral for a fraud investigation. (R. 101.) Of course, at that time, plaintiff had no contract claim pending against the government.

In sum, Mr. Dyer's fraud referral, which he admitted was a very serious matter, was primarily based upon approximately five grounds, which gave rise to his suspicions: (1) comparative salary and bonus data for a particular period of time; (2) relatively few Board minutes unsigned by Mrs. McManus concerning subjects he considered important enough to have been signed by Mrs. McManus although they were signed by the other two officers; (3) Mr. Harden's lack of immediate access to Mrs. McManus' computer, which was explained to him at the time; (4) unmeasured, comparative office sizes; and (5) the presence of boxes in her office containing unidentified materials. (R. 103–4.)

In April 1994, Seven Lowhurst, an investigator employed by the Criminal Investigative Division ("CID") of the U.S. Army, based upon a referral to the CID from the Department of Justice requesting the CID investigate H.B. Mac for fraud, received the assignment of carrying out this investigation. At that time he had no prior experience involving the government's SDB program and had only approximately fifteen months experience with the CID and about six years prior, unrelated experience as an investigator with the State of California. Mr. Lowhurst, accompanied by another CID investigator, Mr. Broden, after unsuccessfully attempting to arrange a meeting with Mrs. McManus without others present, finally met with plaintiff's officers at H.B. Mac's offices in San Diego, California. When they attended this meeting in April 1994, they both wore their side-arms.[15]

Upon commencement of the meeting with H.B. Mac's principals, Mr. Lowhurst unequivocally stated that he and Mr. Broden were there on a criminal investigation. However, neither Mr. Lowhurst nor Mr. Broden gave any warning to plaintiff's principals as to their right to have counsel present. To the contrary, Mr. Lowhurst advised plaintiff's principals, not once but several times, that counsel was not necessary. He also advised that the investigation did not relate to the Ft. Shafter contract though he had put Ft. Shafter documents on the table before the principals. When it was pointed out to Mr. Lowhurst that the documents did in fact relate to the Ft. Shafter contract, Mr. Broden said, "No, no, no. You're way off. Doesn't have anything to do with it." Mr. Lowhurst's manner was intimidating, over-bearing, and unprofessional. He accused Mrs. McManus of being simply a "housewife" and a "diaper changer." (R. 661.)

Mr. Lowhurst made no real effort to obtain responses to the matters that were the basis for the investigatory referral. For example, he did not ask questions of Mrs. McManus regarding her prior business experience, her office size, the use of her office for storage, access by others to her computer or any of the factors allegedly relied upon by Mr. Dyer in determining to refer the matter for investigation or that would more directly relate to her exercise of day-to-day control over the business.[16]

Defendant offered the testimony of Mr. Sinha, acting chief of the SDB and 8(a) program, in an effort to show how he would have interpreted the relevant provisions of the regulations and applied them under the alleged facts of plaintiff's case had there been

15. Although what occurred at this meeting is disputed, what is clear from plaintiff's credible evidence respecting the meeting, is that Mr. Lowhurst's manner was rude, belligerent and intended to intimidate and threaten plaintiff's officers. He threw various contract documents down upon the meeting table and when asked about the purpose of his investigation, he denied that his questions had anything to do with the Ft. Shafter contract. However, the Ft. Shafter contract solicitation was one of the documents he threw down on the table.

16. Mr. Lowhurst's written report contains no quotes of statements by any of the principals of H.B. Mac but only Mr. Lowhurst's interpretations of those statements. Mr. Lowhurst's report of the investigation dated September 13, 1994 states that he read or showed certain documents to Mr. and Mrs. McManus and to Mr. Hardin. DX 3, 9A, 9B, 9C, 9E, 9F, 9G.

a protest of plaintiff's status. However, at the time of his testimony he had been reviewing eligibility criteria for only about a year and one-half. He was then the sole agency contact for SDB protests, evaluations, and determinations. Also, at that time he had reviewed only about 320 protests filed against SDBs. The governing regulations are poorly structured. (R. 490.) However, in Mr. Sinha's view, the broader term, "retained earnings," as used in the regulations relates only to ownership of the business and is separate from the control and management requirement. (R. 495.) Mr. Sinha recognized that Mrs. McManus had many years of experience as an interior decorator. However, based upon his reading of the Standard Industrial Classification Code classification, which separately classifies the interior design field, in which Mrs. McManus had years of experience, from the construction field, Mr. Sinha concluded that Mrs. McManus' education and experience would not qualify her to control and manage a general construction firm such as H.B. Mac.

Mr. Sinha's opinion was also based upon Mrs. McManus' having granted signature authority to Mr. Harden and Mr. McManus and her lack of a detailed understanding of such things as: (1) the company's bank accounts for some periods; (2) her gross income for particular accounting periods; (3) the company's payment of interest for Boulevard Associates in which she had no direct ownership interest; (4) the company's insurance needs and bonding requirements for bidding projects; (5) the specific type of state business license the company had been issued; (6) her perceived lack of day-to-day involvement in solving technical problems; (7) her occupancy of a nonfunctional office only part time or as needed; (8) the potential for nondisadvantaged officers to control the company; (9) her salary and bonus compared for some unstated period to the two nondisadvantaged officers; (10) her lack of knowledge of the company's gross receipts for the last two years; (11) her failure to have a corporate credit card or knowledge of what charges were being made to other officers' cards; (12) her lack of personal knowledge of certain contracts and contract completion dates; (13) her lack of knowledge of the way in which bonuses were calculated and paid; and (14) her lack of technical knowledge of contract scheduling. (R. 531–542.) However, Mr. Sinha readily admitted that Mrs. McManus did not necessarily need technical expertise to "control the business," (R. 512), and he agreed that she, as president of an SDB, could acquire on-the-job managerial skills and expertise on the project. (R. 513.)

Mr. McManus testified that he felt a duty neither to inform counsel as to the particular limits of Mrs. McManus' knowledge of the company's business during these discussions nor to audit the company's books personally to verify salaries and bonuses during 1991 or during any other period. Mr. McManus testified that he did not understand the term of art, "compensation," as used in the regulations.

Mr. Harden's testimony corroborates the testimony given by Mr. and Mrs. McManus regarding the good faith intent of H.B. Mac's principals, all of whom relied upon Mr. Moore's assurances that after reorganization the company would be a fully qualified SDB and could thereafter operate in compliance with all applicable regulations. (R. 906.) He agreed that Mrs. McManus' management style was to not change business practices that worked well. (R. 907.) He testified also that he personally thought they were in compliance since they had been protested twice and after they supplied information the protests were withdrawn and they had been awarded the contracts. (R. 908.) He also confirmed that the boxes temporarily placed in Mrs. McManus' office contained computer parts which were to be given to charity. He said as Corporate Secretary only his signature was necessary upon minutes of the board of directors to make them legally effective. (R. 911.) He stated that the company properly self-certified as an SDB on June 13, 1991, because they had followed the advice of their counsel and their status had not been successfully challenged in the past.

Plaintiff offered PX 48, a summary of earnings which plaintiff's counsel had prepared immediately prior to trial to show how the company accrued earnings. It was prepared from data previously furnished to de-

fendant in the form of personal tax returns, profit sharing plan information, W–2 forms, corporate minutes, financial statements prepared by plaintiff's accounting firm and other data. According to plaintiff, all of this data was known by defendant or had been previously provided to defendant. (R. 586, 792.) PX 48 was received into evidence over defendant's objections but only for the limited purpose of showing, in summary form, what plaintiff contends was the total amounts credited to each of the three officers of H.B. Mac during the calendar year 1991 in several categories. According to this exhibit, in 1991 these several amounts totalled $144,249.74 for Mrs. McManus, $121,910.89 for Mr. Harden and $101,140.22 for Mr. McManus.[17]

13 C.F.R. § 124.601(a) of these regulations requires that procedures apply whenever the SBA is asked to make a determination, following a competitor's protest of a contractor's status as a qualified SDB, as to whether the particular contractor whose status is being challenged, is actually socially and economically disadvantaged for purposes of the SBA's and DOD's SDB set-aside contracts. Sub-part (b) of that section instructs the SBA, in making a status determination of a particular concern, to use the definitions of social and economic disadvantage and other eligibility requirements in sub-part (a), including the requirements placed on ownership and control, and, in addition, for purposes of SDB set-asides and SDB evaluation preferences only, to require that a majority of such concern's earnings directly accrue to the disadvantaged individual who owns and controls it. Finally, the SBA is to apply these definitions in accordance with the presumptions contained in section 8(d) of the Small Business Act, 15 U.S.C. § 636(d).

Under 13 C.F.R., Section 124.602 an SDB is a concern 51% of which is owned by one or more socially and economically disadvantaged individuals, having the majority of its earnings "accruing directly" to such individuals and whose management and daily business operations are controlled by one or more of such individuals. Also, under Section 124.103(b), (e)(1) and (2) the unconditional ownership requirements is again stated as being at least 51% of the corporate stock and there is a requirement regarding receipt of at least 51% of the dividends paid on the stock.[18] Defendant's argument is focused upon the language of Section 124.104. That section provides, as here pertinent, that a concern's management and daily business operations must be controlled, on a full-time basis, by a socially deprived owner(s) having managerial or technical experience and competency directly related to the primary industry in which the applicant concern is engaged *as determined by the SBA.* Subparagraph (b) says that such individual shall control the board of directors of an applicant either "in actual numbers of voting directors or through weighted voting." However, it is entirely possible that the SDB could, upon the submission of a protest, determine that the disadvantaged individual is in control of the company, even though she may cast only one of three votes, if she could, at any time fire the other two Board members. Subparagraph (c)(1), provides, conversely, that others within the concern or members of their households may not exercise control or have the power to do so. Obviously, if Mrs. McManus was and is in actual control of plaintiff, there would be no violation of this subparagraph.

Subparagraph (c)(3), prohibits "excessive compensation" being paid to a nondisadvantaged owner. It defines "excessive compensation" as that paid in any form including

---

**17.** This document reflected actual salaries the principals had received, the amounts they were entitled to receive and the amounts accrued to them. The court finds no prejudice to defendant in the court's receipt into evidence of PX 48 since the document, for the most part, simply reflected a summary of data already provided at various times to defendant in other documents. (R. 679.)

**18.** However, Section 124.103 is not here relevant because defendant does not contend that Mrs. McManus, as the individual upon whom plaintiff's eligibility is based, does not own sufficient corporate stock or would not be entitled to receive at least 51% of all stock dividends paid or that she would not be entitled to receive, upon dissolution, at least 51% of the retained earnings of the concern and 100% of the value of each of her shares. Nor does defendant contend that Mrs. McManus does not qualify as a disadvantaged individual although she is only one/sixty fourth Native American.

dividends exceeding that "received" by the chief executive officer or president, as the case may be. However, the regulatory proviso following this definition says that with the consent of the AA/MSB & COD, or designee, this individual "may be paid a lower salary than a non-disadvantaged individual if it is demonstrated to be in the best interest of the applicant or 8(a) concern."

Subparagraph (d) warns that nondisadvantaged individuals may be found to control or have the power to control in certain enumerated, illustrative only, circumstances such as if the nondisadvantaged individual controls the voting board of directors either directly, through majority voting membership, or indirectly, if the by-laws allow such individual to block any action proposed by the disadvantaged individual through negative control. The example given, which the drafters of these regulations apparently felt *could create* negative control, is where there is an equal number of disadvantaged and nondisadvantaged voting directors or, as provided in subparagraphs (d)(2), the nondisadvantaged individual as an officer or member of the board of directors has the power to control day-to-day direction of the business affairs of the concern.[19] Moreover, it is abundantly apparent to the court that these SDB regulations are at least confusing and ambiguous. Defendant's recommendation that this court rely upon the SDB's present interpretations of these regulations, as provided by Mr. Sinha, to prove plaintiff's liability under the FCA, FFCA, and theories of common law fraud is unavailing and totally unpersuasive.

The regulations use the term "earnings" in describing the amount which may accrue directly to the owner or owners of a business. This fact contributes to the confusion over whether the term "retained earnings" is being used in one place in the regulations interchangeably with, or with the same meaning as, the term "compensation" used elsewhere in the regulations. Although defendant's counsel accused plaintiff of confusing the terms, she did this herself in stating that "The fact is that retained earnings goes to compensation." (R. 25.) Unfortunately, no where in the regulations are these terms clearly defined. From the court's reading of the regulations it is not a strained interpretation of these terms to conclude that compensation was intended to include retained earnings or accrued earnings. Certainly, nothing in the cloudy terminology found in these regulations speaks with the clarity needed to necessarily attribute to Mrs. McManus and the other principals in this small business, the knowledge that regardless of the form of payment or accrual of funds to her account, the total amount of compensation she actually received or had accrued to her account for tax purposes for some discrete period, was insufficient to cause her not to be the highest "compensated" person in the company. Moreover, the vagueness of the wording of these regulations apparently has caused a great deal of confusion to many applicants who have similarly self-certified during recent years.[20]

Ownership of a majority of the stock—in this case, 80% of the voting stock—of an SDB is not simply one element to be considered in determination of control of an SDB but it is the most essential element because it empowers such an owner, almost at will subject only to by-law notice requirements, to elect all of the members of the board of directors. Further, because of the control inhering in this electoral power, such an owner could almost at any time, change the by-laws, remove non-performing officers and elect replacement officers, change the duties and assignments of these officers or take any other such management action deemed desirable, according to any management plan that such a controlling owner might choose. This undeniable fact of corporate governance assured that when Mrs. McManus received 80% of plaintiff's voting stock, which she unquestionably did, from Messrs. McManus and Harden through an assignment, they relinquished to her actual

---

19. Subparagraph (d)(3), relating to control stemming from the nondisadvantaged individual's provision of critical financial or bonding support or licenses. This provision is clearly not applicable to the facts in the case at bar.

20. Mr. Sinha candidly admitted that a majority of SDB applicants had misinterpreted various facets of the governing regulations.

control and certainly the ultimate power to control the business. In fact, they were told this by company counsel, Mr. Moore, whose stated interpretation of the applicable SDB regulations was that because of the corporate reorganization, she was in control of the business and the company was then a properly and legally qualified SDB. Mr. Moore fully understood that plaintiff's qualification as an SDB was an agreed upon pre-condition that all three principals made with respect to the reorganization plan. Mr. Harden even met separately with Mr. Moore prior to the company's reorganization. At that time, Mr. Moore again explained the matter of control to Mr. Harden. so that he fully understood the effect of his transfer of most of his company stock to Mrs. McManus. Clearly, Mr. Harden understood and agreed that by his and Mr. McManus' transfer of voting stock, Mrs. McManus would then be placed in control of the company.

The conclusion is inescapable that from the outset of the reorganization, all of plaintiff's principals fully intended that Mrs. McManus would control the business regardless of the fact that Messrs. McManus and Harden served on the Board and that, apparently, there were no by-law provisions allowing for weighted voting of her stock. Plaintiff's evidence convincingly established this intent. The court finds, accordingly, that all three of plaintiff's principals clearly believed that an actual transfer of control had occurred in connection with the company's reorganization and that based upon counsels assurances, they would, after reorganization, collectively own a fully qualified SDB.[21]

The conclusion is inescapable that Mr. Dyer's auditing of plaintiff's records was performed superficially, and, at best, his referral for fraud investigation was premised upon unfounded suspicions that could have easily been allayed had plaintiff's officers been given a fair opportunity to respond to pertinent questions relating to concerns raised by the audits. His explanation of why he failed to question plaintiff's principals rings hollow. The only prohibition against questioning by an auditor is found in Section 4–702.5 of the regulations, DX 2, but that regulation does not prohibit discussions with or questioning of officers or directors respecting any of his specified areas of concern. Moreover, defendant has cited to no state corporation law requirement that officers or directors are required to sign all meeting minutes. The signing of the board of director's meeting minutes is mentioned no where in the SDB regulations. There is no element of fraud necessarily present in the innocent failure of corporate minutes to go unsigned by the president of the corporation. In fact, Mrs. McManus could have been present at most, if not all, of the meetings that reflected minutes not signed by her, but Mr. Dyer never inquired of anyone as to whether this had actually occurred. (R. 109.) He trusted his suspicions without a proper investigation.

Further, Mr. Dyer's testimony reflected a surprising lack of knowledge and understanding of the meaning of the representations and certifications made by plaintiff and of the phrase "the majority of earnings which is directly accrued to such individuals." In short, he made his fraud referral on no clear understanding of the meaning of the term "earnings" and he admitted, in effect, that the term is ambiguous because there are various reasonable interpretations of that term. (R. 113.) Mr. Dyer attributed some of his suspicions regarding Mrs. McManus lack of control over the business to what he perceived as Mrs. McManus' occupancy of a smaller office than those occupied by other company officers. However, he took no measurements of office sizes—not even any rough measurements. The fact that he re-

---

**21.** Defendant's counsel, Ms. Meyer, completely failed to understand that simply proving that during some particular time period—for example, when the Ft. Shafter contract bid was submitted—that Mrs. McManus was not the most highly compensated individual in the company, even if this were proven to be true, does not *ipso facto* entitle defendant to summary judgment on the issue of fraud. Ms. Meyer contended, "So if this is concluded as to compensation the United States would move for summary judgment on the grounds that they have admitted no evidence on the fact that Mrs. McManus is the most highly compensated individual." (R. 727.) This contention completely ignores defendant's burden of proof, i.e., plaintiff's actual knowledge or scienter of its failure to qualify as an SDB or plaintiff's willful disregard of the facts clearly showing its failure to qualify.

lied at all upon comparative office size as a factor in his determination of control under the regulations, is incredible.

The testimony of Mr. Sinha was offered as a witness by defendant to explain how the SDB regulations should be interpreted. This testimony, however, is of no moment for it is solely within the court's province to interpret and ascribe meaning as a matter of law to the complex, poorly-worded, SDB regulations relating to control of a business for purposes of determining whether plaintiff knowingly misrepresented or willfully disregarded its status and, thereby, attempted to perpetrate a fraud upon the United States. Indeed, if anything, Mr. Sinha's testimony supports rather than harms plaintiff's case.[22] Although Mrs. McManus had but one vote on a three member board of directors, she controlled all three voters. If she ever disagreed with the majority vote of the other two members of the company's board on any matter under consideration, she always had the power, subject to notice requirements, to immediately call a stockholder's meeting and, pursuant to applicable company by-laws, to lawfully remove them from the board of directors and replace one or both of them so as to assure conformity with her wishes and direction. Finally, there is no evidence that the board of directors ever took any action in conflict with her personal wishes. To the contrary, the evidence suggests that all actions of the company's board of directors at all times were in consonance with her managerial wishes.

Other than the regulations themselves and the few illustrations provided therein, there are no written guidelines for a self-certifying SDB to follow in interpreting these regulations. Since inception of the SDB program, no one within the SBA or SDB, including Mr Sinha, has ever provided advisory opinions to companies seeking to determine, in advance, the meaning of any of the terms used in the regulations. Mr. Sinha readily admitted to these facts during cross examination. Mr. Sinha only provided an opinion

when there was a protest of the status of an SDB by another party. (R. 553.) Mr. Sinha had no experience as an officer of any corporation in California or in any other state. In answer to a direct question from Mr. Bruckner, plaintiff's counsel, he responded that he had no reason to believe that Mrs. McManus was not acting in good faith in attempting to reorganize the company as a properly qualified SDB. (R. 558.) Further, during cross examination, Mr. Sinha could think of nothing else that plaintiff should have or could have done at the outset, in the absence of a manual or written guidelines or provisions for guidance interviews with applicants, other than what plaintiff's principals did—i.e. consult experienced corporate legal counsel in whom they had trust and follow that counsel's advise as to the meaning of the regulations. (R. 571.) Moreover, Mr. Sinha admitted that there are no regulatory quantifications for determination of some minimum level of operational experience or training in either business management or possession of technical skills in any primary industry. Thus, a person's experience could be very limited or extensive. (R. 573.) It is all subjective. (R. 573.) Although he might choose to do so, Mr. Sinha said he has no duty to help any one become qualified as an SDB even under his own subjective view of the meaning of the regulations. (R. 575.) In other words, he was free to advise a company as to compliance but he could also advise it to seek the advice of counsel. Mr. Sinha would not have given Mrs. McManus credit for her experience in the field of interior design. His only reason for doing so was that interior design's SIC code differs from the SIC code for construction. (R. 578.) Finally, Mr. Sinha had no knowledge of the particular business license that a construction contracting firm needed to conduct business in California. (R. 579.)

It is clear from Mr. Sinha's testimony that there was no clear-cut procedure in 1991

---

**22.** The court notes that Mr. Sinha had little or no knowledge of the duties of a corporate secretary, a position Mrs. McManus had held with H.B. Mac prior to its reorganization. He gave her no credit for any operational skills, direct experi- ence in subcontracting construction projects, or general business knowledge that she might have acquired in that position or in operating an interior decorating business.

when the Ft. Shafter contract was let, nor for that matter is there any such procedure today, whereby a self-certified SDB can be sure, even with the advice of competent corporate counsel to assist it in interpretation of the regulations, that it is, in fact, properly qualified as an SDB. The SBA is the only government agency charged with responsibility for interpreting the regulations with regard to the propriety of a company's SDB status and it makes that determination usually in the context of a competitor's protest. Based upon the qualifications of Mr. Sinha, its expert, that agency, regrettably, has demonstrated little expertise in interpreting the qualifications of companies purporting to be SDBs and absolutely none in determining the good faith intentions of companies purporting, through the self-certification process, to be SDBs. (R. 621.) Mr. Sinha would not say, unequivocally, that H.B. Mac was not at any time a qualified SDB but only that "he had a lot of questions." (R. 622.)

Plaintiff's evidence convincingly establishes that all of H.B. Mac's officers acted prudently and in good faith in hiring counsel to assist them in organizing the company as a qualified, legally constituted SDB under all applicable regulations. At no time, either at the inception of the new company in 1988 or thereafter, did any officer, whether in connection with the Ft. Shafter contract or another, knowingly, willfully, or recklessly disregard any interpretation of the SDB regulations governing the company's SDB status. (R. 653–657.)

The documents Mr. Lowhurst claimed he read to the principals of H.B. Mac during his meeting in plaintiff's offices were not clearly identified to plaintiff's officers. However, in any event, the court is satisfied that, under the circumstances here presented, CID investigators Lowhurst and Broden over-

reached in their investigative zeal. Whether or not they were required by CID regulations to wear their sidearms to the meeting, the court finds that their actions were intended to intimidate and frighten the officers of H.B. Mac. Their limited and clumsy questioning of plaintiff's principals indicates that they were not seeking to elicit all of the facts fairly, whether favorable or unfavorable to H.B. Mac's SDB status. The court finds that their true intent was to intimidate plaintiff's principals without constitutional warning and, thereby, possibly to obtain damaging admissions. Obviously, plaintiff's principals, at the least, were entitled to a clear statement from these CID investigators at the commencement of the meeting as to the true purpose and nature of the investigation.[23] The court finds that the self-serving statements of Investigators Lowhurst and Broden are neither reliable nor credible. Accordingly, the court gives no probative weight to the statements contained in their investigative report and to Mr. Lowhurst's trial testimony submitted in proof of defendant's counterclaims in fraud.

Obviously, as plaintiff's evidence shows, there were many day-to-day operational practices that were not clearly assigned to a particular officer in the company. Plaintiff's business practice was to continue a particular delegation of responsibility if it proved successful. Some accounting and payment functions and procedures were not as carefully shown in the company's records as they would have been had the principals been aware that the government might take the position that the company's SDB status was subject to challenge because of the government's interpretation of the term "compensation" as used in the regulations. With the advantage of hindsight, these practices might be classed as "slip-shod" or even negligent but based upon the facts of record, the court

---

**23.** In these circumstances it is easy for the court to conclude that the investigators were trying to obtain incriminating admissions against interests without such principals having an opportunity to have legal counsel present to advise them of their fundamental constitutional rights. *This is true because the responses these two investigators sought carried possible criminal prosecutorial exposure to all of the principals.* However, they gave no warning of this whatsoever. Further, their actions went beyond silence for they tried

to assuage the fears of the principals by denying that their investigation had anything to do with the Ft. Shafter contract. This was not true. The Ft. Shafter contract, as testified to by H.B. Mac's principals under oath, was one of the documents brought to the meeting and placed in threatening fashion before plaintiff's principals. Investigators Lowhurst and Broden were gratuitously discourteous, overbearing, and unprofessional during the meeting.

finds that the weight of the evidence on the whole, reflects no conscious effort by any of the principals or anyone within the company to obscure or misrepresent the company's SDB status or to knowingly, intentionally, or by willful negligence or disregard, mislead or defraud the government at any time, whether at the time H.B. Mac submitted its bid, entered into the Ft. Shafter contract, performed, or submitted its differing site condition claim.

Government's counsel vehemently rejected the court's many efforts to effect a satisfactory settlement of this case—one which would have allowed defendant to win its defense of plaintiff's differing site condition claim and avoid the cost and expense of a trial of defendant's counterclaims in fraud. Thus, defendant demanded and received a full and fair opportunity to press its charges against this small company, and it has vigorously done so. The court's careful examination of the evidence presented by both plaintiff and defendant, as outlined above, clearly shows that the government's fraud charges are without merit. In fact, the government's evidence consisted largely of circumstantial evidence which plaintiff's witnesses have believably and convincingly explained or rebutted to this court's entire satisfaction.

Messrs. Harden and McManus, along with certain others, as operating officials, reported to the board of directors and were subject to being terminated by Mrs. McManus if they did not perform as she expected. Creditable evidence presented by plaintiff proved beyond doubt that Mrs. McManus, through her 80% ownership of all outstanding stock in the company, did exercise sufficient control over the board of directors to meet normal operational criteria for a small company whether or not an SDB. Whenever she attended meetings, which she normally did attend, regardless of the form and sparse content of the minutes of these meeting or any later corrective changes which may have been made therein, she made decisions as president and chairperson of the board of directors which were consistent with her level of expertise and experience in the business and her understanding, acquired from company counsel, of the requirements for maintenance of the company's SDB status. Initially, she determined to keep in place successful company policies and operational practices which were on going when she acquired 80% of the stock and took over actual control of the business. Her testimony was to the effect that she saw no reason to modify successful operating practices because they were producing a profit for the company. The court finds that this was a rational and prudent business determination under all of the circumstances shown on this record. In other words, by not changing successful policies and practices, which as 80% stockholder she had the power to do, she exercised intelligent control over the affairs of the company. In short, the court reject defendant's counter argument, that by not changing company policies, she was exhibiting her lack of control over the business.

Further, the facts show beyond any reasonable doubt that Mrs. McManus and both Messrs. Harden and McManus, believed in good faith that Mrs. McManus was in full control of the company from the time she first acquired 80% of the stock in the company and that her control continues to the present. This conclusion is supported by the conduct of Mrs. McManus prior to her deposition and trial. Obviously, Mrs. McManus made no special effort to prepare for her deposition. She admitted, quite candidly, that she had little personal knowledge of individual contracts, specific subcontractors used on various projects and the methods used for bidding projects. Also, she had limited familiarity with certain project sites. Much of the company's financial and accounting data as well as other technical matters require special skills. She could have easily prepared herself better for her deposition and trial testimony to provide more complete, knowledgeable answers to the detailed questions she was asked. However, she attempted to answer forthrightly all questions to the best of her admittedly limited knowledge. While this may not be the most strategic of litigation approaches, it certainly supports the sincerity, truthfulness, persuasiveness, and reliability of her statements. In short, all of plaintiff's witnesses were credible. Defendant's witnesses, as discussed above, were not.

Defendant has failed to show by a preponderance of the evidence that Mrs. McManus or any other officer of H.B. Mac had actual knowledge during any critical time period subsequent to plaintiff's reorganization that plaintiff's status was not that of a properly qualified SDB under the applicable regulations. Nor has defendant shown that plaintiff or its agents recklessly disregarded the facts relating to Mrs. McManus' lack of business control such that this court can attribute to her knowledge that plaintiff's true status was not that of a properly qualified SDB. Defendant has failed to establish that H.B. Mac fraudulently certified its SDB status, obtained work to which it was not entitled, or filed a claim that intentionally or recklessly misrepresented its status. Plaintiff's witnesses were credible but defendant's witnesses were not. Defendant's witnesses' testimony, for the most part, was intrinsically unpersuasive to the court, even when their testimony was unopposed and is, therefore, not conclusive. *Sternberger v. United States,* 185 Ct.Cl. 528, 536–37, 401 F.2d 1012, 1016–17 (1968). Accordingly, the court finds that the government has totally failed to prove its fraud counterclaims by the requisite elements of proof.

## II. *The Contract Claim*

■ The purpose of a differing site condition clause is to provide the government with more accurate bids by discouraging inflation for risks that may not occur. Such clauses ease the contractor's burden of risk assessment and site investigation. *Foster Constr. C.A. & Williams Bros. Co. v. United States,* 193 Ct.Cl. 587, 613–14, 435 F.2d 873, 887 (1970). Differing site conditions can arise in two circumstances: (1) conditions differing from the contract indications; and (2) those differing from conditions normally encountered. These are usually referred to as Type I and Type II differing site conditions, respectively.[24]

FAR Clause 52–236–2(a) "Differing Site Condition" provides established guidelines for proof of entitlement to recovery of costs by a contractor for a changed condition during performance of a contract, as follows:

> The contractor shall promptly, and before conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ from those indicated in the contract, or (2) unknown physical conditions at the site of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided in this contract. . . .

## A. Type I Differing Site Condition

■ To prevail on a Type I differing site condition claim, a contractor must first prove by a preponderance of the evidence that "the conditions 'indicated' in the contract differ materially from those it encounters during performance." *Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1581 (Fed.Cir.1987); *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 916 (Fed.Cir.1984). *See also Arundel Corp. v. United States,* 207 Ct.Cl. 84, 105, 515 F.2d 1116, 1128 (1975). The meaning of the term "indicated" is a legal determination to be made in the court's discretion from the vantage point of what a reasonably prudent, knowledgeable and experienced contractor would have expected when bidding the contract. *P.J. Maffei,* 732 F.2d at 916–17. A material discrepancy between what is indicated in the contract documents and what is encountered at the site can result in unanticipated costs for which the government would be liable. The indications need not be explicit, but rather, they may be proven by inferences and implications in the contract documents. *Foster Constr. Co.,* 193 Ct.Cl. at 594, 435 F.2d at 876. Further, plaintiff need not prove a deliberate or negligent misrepresentation by the government in the contract documents. In fact, all plaintiff need show to prevail is a material variation between the subsurface conditions stated in the contract and those reasonably unforeseen actually en-

---

24. Plaintiff in the case at bar asserts a Type I differing site condition. Credible evidence suggests that a sufficient basis might also exist for plaintiff's assertion of a Type II differing site condition claim. However, since plaintiff has asserted no such claim, the court declines to examine the merits of a Type II differing site condition claim.

countered at the site. *Id.* at 602–03, 435 F.2d at 873. However, although the subsurface or latent physical conditions need not be hidden from view, conditions which are discoverable by a reasonable site visit and diligent review of the contract documents are chargeable to the contractor. *Dayton Constr. Co.*, 88–2 B.C.A. ¶ 16, 809 (HUDBCA 1988); *see also* JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 524–26 (3d ed. 1995). The term "contract documents" as used in this FAR Clause has been given a broad interpretation to include all bidding documents furnished to bidders as well as any materials furnished or referred to in the bidding documents, site investigation reports, soil surveys, and geologic information. *Hunt & Willett, Inc. v. United States*, 168 Ct.Cl. 256, 351 F.2d 980 (1964); *Felton Constr. Co.*, 81–1 B.C.A. ¶ 14,-932, 1981 WL 6985 (AGBCA 1981).[25] In other words, to be a Type I condition, the condition must be "reasonably unforeseeable on the basis of all the information available to the contractor at the time of bidding." *Mojave Enterpr. v. United States*, 3 Cl.Ct. 353, 356–57 (1983).

■ In *Youngdale & Sons Constr. Co., Et al. v. United States*, 27 Fed.Cl. 516 (1993), this court set forth six indispensable elements that a claimant must establish by a preponderance of the evidence in order to recover for a Type I differing site condition claim. The elements of this six-pronged test are: (1) the contract documents must have affirmatively indicated or represented the subsurface or latent physical conditions which form the basis of plaintiff's claim; (2) the contractor must have acted as a reasonably prudent contractor in interpreting the contract documents; (3) the contractor must have reasonably relied on the indications of subsurface or latent physical conditions in the contract; (4) the subsurface or latent physical conditions actually encountered within the contract area must have differed materially from the conditions indicated in the same contract area; (5) the actual subsurface conditions or latent physical conditions encountered must have been reasonably unforeseeable; and (6) the contractor's claimed excess costs must be shown to be solely attributable to the materially different subsurface or latent physical conditions within the contract site. To prove these six elements, the contractor is only required to use a simple logical process in evaluating the information in the contract documents to determine the expected subsurface or latent physical conditions. *Titan Atlantic Constr. Corp.*, 82–2 B.C.A. ¶ 15,808, 1982 WL 7112 (ASBCA 1982). Other cases have restated these same elements in varying ways. *See Weeks Dredging & Contracting, Inc. v. United States*, 13 Cl.Ct. 193, 218 (1987), *aff'd,* 861 F.2d 728 (Fed.Cir.1988); *Neal & Co. v. United States*, 36 Fed.Cl. 600 (Fed.Cl.1996).[26] Based upon the foregoing legal principals and the evidence presented by the parties

**25.** The court notes that under FAR Clause 52.236–2(a), a contractor claiming entitlement to an equitable adjustment for a Type I differing site condition, must promptly, *before conditions are disturbed,* give a written notice to the Contracting Officer of any complained of subsurface or latent physical condition. Strangely, in the case at bar, it appears that immediately after failure of the temporary safety shoring at the oil/water separator, H.B. Mac removed the failed temporary shoring and backfilled the site before giving any notice to the Army. Thus, it is unclear whether plaintiff gave the Army such notice and a reasonable opportunity to inspect the site before the backfilling occurred. In any event, the Army took no soil samples for analysis and accepted the bucket of soil, provided by plaintiff as being representative of the alleged unusual soil found at the site, which defendant later analyzed. Defendant has never argued that in backfilling the site prior to giving the Army notice of the problem at the oil/water separator site, H.B. Mac

vitiated its right to seek an equitable adjustment for a changed condition under the Contract's Differing Site Condition clause. Accordingly, defendant has waived any contention in this regard. The court concludes that further consideration this matter is unnecessary.

**26.** It is apparent that some of these six elements overlap because their proof obviously involves consideration of many of the same factual matters. For example, elements (2), (3) and (5) all generally relate to the reasonableness and prudence of the contractor's actions and may be telescoped into one consideration. Although this approach necessarily involves some otherwise unnecessary repetition and a more lengthy analysis, the court nevertheless adheres to a separate analysis of each of these six elements, as the parties have done in their respective presentations of their cases, in order to more closely track the parties evidence and arguments.

with respect to these six indispensable elements during trial, the court makes the findings of facts and draws the corresponding conclusions of law which follow.

### 1. The Contract Documents Must Have Affirmatively Represented the Subsurface or Latent Physical Conditions.

The Army, as a part of the contract documents furnished to bidders for the Ft. Shafter contract, provided only eight soil borings, as shown on Drawing C–2. There were nine borings actually shown on the drawing but one of these was merely illustrative and not representative of an actual core sample.[27] These eight borings vary in depth from six feet to twenty-four feet and are clustered at the Maintenance Facility. They accurately represented subsurface conditions at the Maintenance Facility, the drainage trench and sedimentation basin.

Defendant first maintains that defendant did not intend that the borings be representations that soil conditions would be the same throughout the site because the Army supplied them as general information only. It argues that, as a matter of law, the contract documents are silent as to subsurface conditions at the oil/water separator site because the borings were approximately 300 yards from the oil/water separator site. Defendant relies heavily upon *Weeks*, also cited by plaintiff, to support its argument that the soil borings, solely because of their distance from the oil/water separator, could not have been intended to represent conditions at the oil/water separator site. Thus, defendant says, also as a matter of law, notwithstanding any admissions or statements to the contrary (which were unquestionably made by Army personnel), this court must follow *Weeks*, a decision affirmed by the U.S. Court of Appeals for the Federal Circuit, and similarly find that the eight borings contained no representations or indications of subsurface or latent physical conditions at the oil/water separator site. In sum, defendant contends that, since *Weeks* is "on all fours" with the

case at bar, a case which this court is compelled to follow, plaintiff has failed to show compliance with the first indispensable element of a Type I differing site condition claim and, accordingly, plaintiff's claim must fail. The court rejects this argument. *Weeks* is inapposite and, therefore, unavailing to defendant as a controlling legal precedent.

In *Weeks,* the boring logs were taken at distances from 100 to 333 yards apart which the court found demonstrated no intent for the boring logs to indicate the location and quantities of various subsurface materials throughout the site. Thus, since there was no representation of subsurface conditions based upon the specific and unique facts involved, the court found a failure of proof by plaintiff. *Weeks* involved a very large monetary claim, exceeding $6,000,000, by an experienced dredging contractor, for excess dredging costs on a forty mile stretch of the Tennessee–Tombigby River Channel due to the unanticipated presence of harder-to-dredge quantities of large gravel and eutaw, a type of hard clay material found in many areas in the south. The contractor, Weeks, admittedly performed an inadequate site visit which failed to acquaint it with much pertinent site information which it could have gleaned from a more reasonable prebid site visit, including the fact that there were two up-river confluences and many gravel operations thereon which could be expected to contribute to higher than normal large gravel deposits within the contract site, particularly on the inside banks of river bends and meanders. Based upon approximately 156 soil borings, many of them very deep, taken for a forty mile worksite, not all of which Weeks considered for purposes of its bid, it significantly underestimated quantities of harder-to-dredge large gravels and eutaw clays, large deposits of which were shown in the borings. Weeks also mistakenly focused upon anticipated logistical difficulties rather than the need for making accurate quantity estimates. However, before submitting its

---

27. PX 44 shows that the Army had, but did not provide to bidders, about 11 other borings drilled at the same time as the eight that were given bidders for the Contract. The other numbered borings are 6–11 and 15–19. However, from this exhibit, the court was not able to determine exactly where these borings were drilled in relation to the oil/water separator site. It is unclear why the Army did not supply these additional borings to bidders for the Contract.

bid, Weeks, because it was a large and experienced dredging contractor, had sufficient time and resources to hire a soils expert who prepared a comprehensive "soil map," using the Uniform System of Soil Classification. The expert, in this specially prepared map, identified the various types of soils to be dredged and extrapolated therefrom the quantities of materials, including large gravels and eutaw, required to be dredged over the entire site.

The court in Weeks concluded that the differing site conditions involved did not primarily relate to the character or nature of the subsurface materials depicted in the contract documents but to excess quantities of gravel, eutaw and unanticipated sizes of gravel. Although Weeks relied upon the government's boring logs, which the government, as a policy matter, says that it affirmatively desires contractors to do to prevent bidders from increasing their bids because of uncertainty as to the reliability of the government's data, the court, on balance, rejected Week's claim. It did so on the primary basis that Weeks had simply failed to prove that its extrapolation of quantities from the borings was reasonable. Weeks, using most but not all of the 156 boring logs, knowingly made a series of unjustified assumptions—that the borings were uniformly positioned over the entire project site, that many were taken in mid-river and that the soils between the borings, up to the various assumed midpoints, would be the same or similar with respect to types and quantities. In actuality, as the court found, the borings were not equidistant as assumed but, to the contrary, they reflected the presence of huge gaps in the distances between them. Moreover, as Weeks well knew, most were not taken in midstream but along the river banks where subsurface conditions obviously could materially differ from the assumed midstream locations. Therefore, because of these and other factors not here present, the court held that Weeks had failed to show that the government intended any specific representations or warranties respecting the quantity of materials throughout the site and, further, that the government had not intended to represent specific subsurface soil conditions but only the general nature and characteristics of

subsurface soils. Although the Federal Circuit affirmed this decision, it did so without any analytical discussion of the lower court's rationale.

It is quite obvious from even a superficial examination of the facts in Weeks, that they materially vary from those presented here. Plaintiff in the case at bar, at the time of its bid, was not a large experienced contractor but a small SDB then headquartered in California with no staff expertise in soils analysis, little experience in performing excavation work in Hawaii and limited financial resources. These circumstances were well known to the Army when it accepted plaintiff's bid. Assuming that an SDB had the financial resources and a reasonable time to do so, there is no evidence that one would have, prior to bid, considered the eight soil borings inadequate or nonrepresentative and obtained or contracted to obtain, at its expense and risk of nonrecoupment, any additional borings. Nor, would such an SDB have sought to develop a similar comprehensive soils map of the area such as that commissioned in Weeks. There simply was no need for it to do so given the borings, the proposed relatively shallow depths of the several excavations needed for construction at the Project site and no specific Army limitations on their applicability. Neither H.B. Mac nor any other SDB under the circumstances involved here could have been expected to perform the same type of comprehensive prebid soils analysis or investigation that a large, experienced government contractor might be expected to perform when he government boring data is limited.

Other pertinent factors also distinguish Weeks from the case at bar. For example, the physical characteristics of the two construction sites, the number and nature of the various borings, the purposes for which they were furnished and way in which they were used all differ. The Project site consisted of a relatively few acres located within Ft. Shafter Flats in Honolulu, Hawaii. The area is volcanic in origin which undeniably indicates a totally different geologic history from that involved in Weeks. Here all eight of the borings were clustered within a relatively few feet of one another as opposed to being

scattered alongside and within a forty mile river segment of a major river system. Plaintiff attempted no extrapolation of data to estimate subsurface soil conditions at derived midpoints *between* these eight borings. Nor did plaintiff fictitiously assume that any of these borings exactly represented conditions at the oil/water separator site but only that they were "indications" of those conditions. Also, H.B. Mac did not rely on the borings to determine *quantities* (in terms of cubic yards) of various materials within a given area. It relied upon these relative shallow borings, in the absence of more specific subsurface data, as constituting reasonable approximations of soil types and thicknesses of soils and limestone at the oil/water separator site, in estimating excavation and backfilling costs. There was no subsurface data presented by the Army in the contract documents or otherwise made available which was in any way contradictory of the boring data. *Ashbach Constr. Co.* 91–2 B.C.A. ¶ 23,787 (PSBCA 1991), *aff'd,* 960 F.2d 155 (Fed.Cir.1992). In fact, as previously noted, the borings proved to be accurate and reliable with respect to sedimentation basin excavation located about the same distance from the soil borings. The court iterates, as a non-local, relatively inexperienced SDB, the government could not have reasonably expected plaintiff, or for that matter any of the other SDB bidders, to independently obtain any additional soil borings data prior to bid again assuming there was sufficient time to do so.[28] A comprehensive prebid site visit, including an examination of the core samples, would not have revealed any pertinent subsurface soils data in conflict with the borings. Accordingly, the court finds that *Weeks* is distinguishable on the foregoing bases.

Of course, the proximity of the borings to the excavation area is important in determining the reasonableness of a contractor's reliance upon soil borings. For example, it probably would not be reasonable for a contractor to rely upon a single boring located 1.35 miles from the excavation site, *GIIS Corp.,* 85–1 B.C.A. ¶ 17,810, 1984 WL 13920

(DOTCAB 1984), but when the evenness of the terrain of the Ft. Shafter Flats area is considered (there were no outcroppings of rock and the like) along with all of the other evidence, plaintiff's bid, based upon the borings, was, to the limited extent hereinafter determined, reasonable. But, again, the distance of the borings from the oil/water separator site is only one factor to be considered along with all other relevant factors in determining the representative nature of the borings.

Further, contrary to defendant's contentions in this regard, the Contract was not "silent" as to subsurface conditions at the oil/water separator site. Plaintiff's evidence is persuasive that the Army's contracting personnel actually *intended* that the eight borings it elected to furnish be representative of the whole construction site. Plaintiff's witnesses, Gary Harden, William Boyd and George Moore, adduced credible testimony that the Army meant for the soil borings to apply to the entire site. The court's independent reading of the SIR supports this conclusion. That document dated August 1, 1989, ¶ 2.0, PROJECT DESCRIPTION, recites that "The project also includes a Military Equipment Parking ("MEP") Area, another parking area, concrete paved loading/staging areas, utilities, site improvements and *renovation of existing wash facilities.*" PX 10 (emphasis added).

Paragraph 3.0 SUBSURFACE INVESTIGATION, provides as follows:

> No additional borings were drilled for this *Final SIR.* The previous borings (drilled in January 1988) and laboratory testing provided sufficient data *for design.*

(Emphasis added.) The SIR clearly shows in paragraphs 2 and 3 that the new wash rack facilities were designed as an integral part of the project. The SIR was not developed just for the Maintenance Facility but covered the entire Project site. It unequivocally shows that the Army gave specific consideration to the need for additional borings and the Army's conclusion was not to obtain any such

---

28. Defendant has presented no evidence that any other SDB bidders obtained additional subsurface soils data prior to submitting their bids in

competition with plaintiff. Presumably, they, too, relied solely upon these same eight borings and bid accordingly.

borings because the eight borings already available provided "sufficient data for design," not for just the Maintenance Facility but for the whole Project, including the oil/water separator unit. Further, various written statements by Mr. Ono and others found in defendant's internal memoranda, PXs 26, 27, 29, afford additional support to plaintiff's contention regarding the broad area to which the borings were meant to apply. These memoranda also refute the conflicting and self-serving testimony of Mr. Okada.[29] In sum, defendant's witnesses' testimony reinterpreting the plain meaning of the language in these internal documents is not credible. The documents are unambiguous, speak for themselves, and refute defendant's argument as to the Army's intent with respect to the representative nature of the soil borings.

Finally, if the Army intended for the borings to apply only to the Maintenance Facility, it could have and should have made this fact abundantly clear in the bidding documents so that all bidders could have had the option of raising their bids accordingly. For example, the Army could have unequivocally stated that the borings were being provided as "historical data given to the contractor as a general guideline" only. *Massman Contracting Co. v. United States*, 23 Cl.Ct. 24, 30 (1991). Of course, had it done so, undoubtedly the Army would have received higher bids, because of the obviously greater risks involved, contrary to the government's stated policy of relieving the contractor of the necessity of allowing for contingencies in bid computation. *Foster Constr. C.A. & Williams Bros. Co. v. United States*, 193 Ct.Cl. 587, 435 F.2d 873 (1970).

The Contract, in paragraph H. 17, referring to FAR 52.236–4 Physical Data (Apr. 1984), contains an exculpatory provision disavowing any representation of accuracy of government furnished data, as follows:

> Data and information furnished or referred to below is for the Contractor's information.

> The Government shall not be responsible for any interpretation of or conclusion drawn from the data or information by the Contractor.

Defendant argues that this provision also supports its contention that the borings were not to be relied upon as an indication or representation of subsurface conditions at the oil/water separator site because to hold otherwise would put the Corps in the untenable position of being unable to provide potentially helpful information without the risk of being held liable for erroneous judgments of contractors inexperienced with the type of contract for which they are bidding. Defendant terms this a conundrum recognized in *Weeks. See* 13 Cl.Ct. at 193. A search of the record reveals that defendant made no mention of this provision during trial or oral argument. Therefore, it is unclear whether defendant intends to rely on this contract provision to exonerate itself from liability. However, defendant's position on brief seems to be that the provision provided it with blanket immunity from liability whether H.B. Mac's interpretation was reasonable or unreasonable. The court disagrees.

This Contract provision does not *ipso facto* place all of the risk of subsurface conditions materially at variance from those shown in government supplied borings solely upon the bidders regardless of what the borings indicate. Information and data provided in contract documents, such as soil bor-

---

**29.** Responsible Army personnel, in the Army's internal documents which included a memorandum and letter, actually agreed with plaintiff's contention respecting the representative nature of these eight borings. In fact, in the Army's Contracting Officer's letter dated November 3, 1992 denying MAC's request for equitable adjustment, he stated that "I do concur that there are no boring logs in the immediate vicinity of the wash rack. Lacking any other subsurface data, I find that it would not be unreasonable to presume that similar conditions existed throughout and to rely on the data provided." PX 26, 27;

(R. 637–640; *Testimony of defendant's witness, Mr. Ono* ). Also, defendant's dismissal of the SIR is cavalier. The SIR, as noted, specifically addressed the need for additional borings and reported that "the previous borings", those done in January, 1988 and the related laboratory tests, provide sufficient data for design, thereby signifying that the Army representatives anticipated, erroneously as it turned out, that the subsurface soils over the entire construction site would be substantially the same or similar. PX 10; (R. 550–552, 601).

ings provided by the government, can have legal significance as contract indications even though there may be express contract provisions seemingly disclaiming that significance. All specifications, drawings, and other requirements of the contract must be examined to determine the nature of the work to be performed and the indications inherent in such documents notwithstanding any governmental disclaimers. Thus, the weight to be given, if any, to the boring data as an indication must depend upon the results obtained from an examination of all relevant factors. For example, one important factor is that a reasonable prebid site visit would not have disclosed any subsurface data in conflict with that revealed in the borings, i.e., it would not have revealed the presence of the extraordinarily thick layer of black silty clay soil, having unusual porosity and instability, or the absence of the layer of limestone at the oil/water separator site. Another factor is that this unique soil was not easy to classify. Defendant now maintains that its expert misidentified it as a CL–CH soil. Moreover, based upon the credible evidence adduced by plaintiff's expert witnesses, this soil may have been even less cohesive than the ordinary sands and gravels shown in the borings. Still another factor is the fact that the Army included no specific limitations or disclaimers of reliability in any Contract documents regarding the borings. Had the Army not intended for bidders to rely upon the borings, except to provide general information, it could easily have said so by inserting clear contract language to that effect. Further, a contractor's use of, and reliance upon, government-supplied boring logs has been accepted even when the contract contains a disclaimer stating that the logs represent conditions only at the exact location of the borings. *Luke Constr. Co.,* 81–1 B.C.A. ¶ 15,23 (ASBCA 1981).[30] Additionally, the Army's boring logs in this case did not just hint at subsurface conditions but actually represented those conditions. *See Woodcrest Constr. Co. v. United States,* 187 Ct.Cl. 249, 408 F.2d

406, 410 (1969), *cert. denied,* 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970). Finally, to allow the government to escape liability on the strength of an ambiguous exculpatory clause would "negate one of the prime reasons for incorporating a 'changed condition' article into these contracts." *See Schutt Constr. Co. v. United States,* 173 Ct.Cl. 836, 353 F.2d 1018 (1965). Although not close to the oil/water separator site, had these data been made available to bidders for the Contract, they may have provided a useful basis for comparison of subsurface data and might have been of some material benefit to bidders in warning of the likelihood of highly variable subsurface soil conditions throughout the construction site. The Army also had records of subsurface conditions from other uses of the site. If defendant knew from its records and from other prior construction projects involving excavation work at Ft. Shafter that these eight borings, drilled in early 1988, were not, in fact, representative for all facilities to be constructed including the wash rack facilities, because of highly variable subsurface conditions, it clearly was guilty of withholding superior knowledge of such conditions. The court finds that the risk of dramatically different subsurface conditions at the oil/water separator site was not a risk to be shifted to bidders by the mere addition of vague, exculpatory language in the Contract particularly when the Contract did not specifically or clearly make such language applicable to the boring logs.

In short, notwithstanding this exculpatory language, bidders were meant to place reasonable reliance upon the borings. Rather than being mere estimates of conditions or unreliable general nature or potentially helpful information, the borings were supplied for the express purpose of representing subsurface conditions throughout the Project site and with the knowledge that all bidders, of necessity, would have to rely almost exclusively upon the borings to make extrapola-

---

**30.** Also, the general language used in this clause falls short of being the type of clear, unambiguous limitation of governmental risk such as was given effect, for example, in *United Contractors v.*

*United States,* 177 Ct.Cl. 151, 368 F.2d 585 (1966) and *Smith Contracting Co. v. United States* 188 Ct.Cl. 1062, 412 F.2d 1325 (1969).

tions to all areas at the Project site when estimating excavation costs.[31]

Accordingly, the court further finds, notwithstanding the above-described Contract provision, that the eight soil borings furnished by defendant as a part of the Contract documents, considered along with all other available data and in light of the absence of any better or more definitive boring data, affirmatively indicated subsurface conditions for the oil/water separator site. *See J.F. Shea Co. v. United States,* 4 Cl.Ct. 46, 51–52 (1983) (stating that legal effect of bidding schedules not nullified automatically by the presence of a Variations in Estimated Quantities clause in the contract.); *Peter Kiewit Sons' Co. v. United States,* 109 Ct.Cl. 517, 74 F.Supp. 165 (1947) (stating that estimates in bid documents not rendered meaningless by approximate quantities clause).

Plaintiff argues, additionally, that based upon the representations of subsurface conditions effected by the eight borings, the Army accepted the differences in the soils from the Maintenance Facility site when compared with those at the trench site, to compensate H.B. Mac for a differing site condition.[32] Therefore, plaintiff submits that it is illogical for defendant to adamantly refuse to fairly compensate it for another differing site condition involving an excavation to a similar depth, which was only another one hundred yards more distant from where the borings were taken. It says that such denial bespeaks of a governmental motive unrelated to the obvious merits of plaintiff's claim in this case.

However, credible evidence suggests that the compared sites are different. At the trench site, because of the presence of a significant quantity of relatively stiff or hard limestone, there was sufficient lateral support for the walls of the trench. Further, at the trench site, the highly porous black silty clay material was not present or only present to a very limited extent. Although vuggy, porous limestone is pervious and would have allowed water into the trench at ground water level, apparently at the trench site it was sufficiently impervious to water to allow for the open trench to be dug and subsequently backfilled without a caving-in of the trench walls or any significant dewatering problem. By contrast there was no layer of limestone present at the oil/water separator site and the unusual and unstable black silty clay material was present in large quantities. The court believes these were material differences in subsurface conditions between the two sites which explain in large measure the reason for the success of the trench excavation and the failure of the excavation at the oil/water separator site. Although to some degree the government's position may be illogical, the court finds no improper or ulterior motive in the government's payment to plaintiff for a differing site condition with respect to the trench site and its parallel refusal to make payment for a differing site condition at the oil/water separator site.

To summarize, the Army provided very limited subsurface data for this Project. That data, because of extraordinary subsurface variations in soils now known to exist within the Project area, was probably only indicative of subsurface conditions at the Maintenance Facility, the trench and sedimentation basin. However, the Army consciously chose to avoid the expense of obtaining more soil borings or providing additional, more pertinent, boring data closer to the other excavation sites including the oil/water separator site. It made this conscious determination after internally recognizing that the

---

**31.** The evidence shows that the Ft. Shafter Flats were once part of an island, known in the 1930's as Makunoa Island, which by the 1940's had been connected to the mainland by fill materials containing clayey silts, coral gravels, basalt sand, gravels and occasional cobbles and boulders. Defendant's records contained much information with respect to the highly variable nature of the subsurface soils within the Contract site. In fact, PX 44 shows that there were eleven additional borings taken along with the eight drilled at the Maintenance Facility. These were boring numbers 6, 7, 8, 9, 10, 11, 15, 16, 17, 18, and 19. The record contains no analysis of these additional borings.

**32.** The facts show that plaintiff, based upon its reliance upon the indications in the borings, vertically excavated a drainage trench to depths in excess of twenty feet, without using sheet pile shoring or dewatering equipment. This trench was located approximately two hundred yards from the Maintenance Facility.

eight soil borings were of questionable value with respect to estimating subsurface conditions at the other excavation sites. Moreover, if the Army actually possessed other relevant boring data, whether from other drillings done coextensively with the eight borings within the Ft. Shafter Flats, or from test pits, geologic reports and the like, the Army failed to provide it to bidders. Accordingly, the court finds that plaintiff has shown by a preponderance of the evidence that the Army intended that plaintiff rely upon these eight borings as representative of the entire work site, including the oil/water separator site. Therefore, with respect to the first requirement of proof for a Type I differing site condition, the court finds that the contract documents, including all bidding documents furnished to plaintiff for the Contract, affirmatively indicated subsurface or latent physical conditions upon which bidders were expected to rely in bidding this work.

## 2. The Contractor Must Have Acted as a Reasonably Prudent Contractor in Interpreting the Contract Documents.

 Plaintiff avers that its evidence has proven that H.B. Mac acted as a reasonably prudent contractor in bidding this project including the work to be done at the oil/water separator site, i.e., in the reliance it placed upon the government furnished soil borings, the method of excavation it chose, the costs it calculated for this work and all other aspects of its actions relative to this Contract. Defendant argues that H.B. Mac made a number of mistakes in its interpretation of the documents because of its alleged lack of engineering skills and experience. Defendant says plaintiff erred or acted without prudence, or unreasonably, in a number of ways including its reliance upon the not-to-scale mechanical drawing, M-6, miscalculation, by underestimation, of the depth of the excavation, misjudgment of water levels and misreading of the boring logs, in determining

what soils to expect at the oil/water separator site.

Although defendant disputes the fact that plaintiff made a prebid site visit, the court believes from the evidence and plaintiff's representations regarding this matter that, prior to submitting its bid for the Contract, Mr. Fisher, conducted a site investigation for plaintiff.[33] Therefore, in bidding this contract, H.B. Mac relied upon its prebid site visit, the affirmative indications in the contract documents, particularly upon Drawings C-1, C-2 and M-6, the boring logs, Mr. Fisher's many years of personal experience during which he bid approximately fifteen other Hawaiian construction projects and H.B. Mac's prior experience in performing other construction projects on the island of Oahu some of which required deep excavation and dewatering. Thus, H.B. Mac contends that it acted as a reasonably prudent contractor in concluding that at the oil/water separator excavation: (1) it would encounter only nuisance water; (2) the sides of the excavation for the separator could be safely sloped on the basis of a ¾:1 ratio, the approximate ratio shown in unscaled drawing M-6; (3) it could use reusable safety shoring rather than sheet pile shoring for all excavations including that for the oil/water separator; (4) an excavation of approximately sixteen feet in depth would be sufficient for placement of the oil/water separator tank based upon the size of the tank it expected to use; and (5) even an excavation to the twenty level would not have required sheet pile shoring and extensive dewatering based upon the borings, some of which showed a thick layer of limestone. Plaintiff argues that the testimony of Messrs. Boyd and Moore demonstrates that since some borings show a limestone layer extending below fifteen, use of sheet pile shoring would not have been contemplated by a reasonably prudent bidder because of the difficulty of driving such metal shoring through hard limestone. Further, plaintiff

---

**33.** During a prebid site visit a contractor ordinarily is given an opportunity to compare any government furnished boring logs with the actual core samples which normally are kept separately for a period of time to allow them to be examined by bidders. Usually, bidders are informed in the contract documents where, during a prebid site visit, they may inspect core samples.

Bidders must log-in or sign some form of admission form in order to get access to the site. If plaintiff did not perform a prebid site visit in this case, defendant could have easily established this fact from the Army's records. In these circumstances, the court concludes that plaintiff, in fact, made a prebid site visit.

says that the presence of the limestone would have provided sufficient support for excavation for an additional six feet below the limestone. Therefore, as testified to by plaintiff's expert, Mr. Boyd, use of sheet pile shoring for that added distance (down to twenty feet), would not have been necessary except under the most extreme circumstances. The court agrees with plaintiff that, as a practical matter, no prudent contractor, would have contemplated driving sheet pile shoring through limestone but would have recognized that excavation of the limestone would have been necessary before installation of sheet pile shoring.[34]

As previously noted, the Army knew that it had offered to bidders a very limited number of soil borings, all drilled at the Maintenance Facility site, which was only one of three principal facilities to be constructed at the site, and that two of these three facilities were located three hundred yards from the Maintenance Facility. In fact, as plaintiff's evidence convincingly demonstrated, after specifically considering whether additional boring data was needed, the Army decided not to drill any additional borings at the other principal construction sites. No prudent bidder would have examined the submitted soil borings and, based only upon the contract's general disclaimer, determined that the submitted borings could not be relied upon as indications of subsurface conditions throughout the site. Nor would any prudent bidder, in the relatively short time available to bid this contract, would have incurred the added bidding expense of independently obtaining additional soil borings at any other location. In short, for purposes of determining whether to actually bid the project, there is no evidence that a prudent bidder would have been willing to assume the risk of recovery of such an initial expense should it be the successful bidder. To the contrary, plaintiff's evidence is convincing that a reasonable bidder would do exactly

what H.B. Mac did and simply rely upon the few soil borings which the Army elected to furnish for this entire site. Moreover, the Army has offered no evidence that any other bidder for the Ft. Shafter contract project did anything other than rely on the Army furnished soil borings. For example, defendant offered no evidence that any other SDB bidders before bidding this contract actually took additional soil borings or, for that matter, reached any different conclusions from those reached by H.B. Mac about these same soil borings.

The borings were accurate for the sedimentation basin and the deep trench. The sedimentation basin, based upon the court's site visit, appeared to be also located approximately three hundred yards distant from the Maintenance Facility where the borings were taken. The oil/water separator site is only one-hundred thirty feet laterally distant from the sedimentation basin. The sedimentation basin required excavation to a depth of approximately thirteen feet. H.B. Mac used a vertical cut to excavate one wall of the basin and a sloped cut for the other walls. This required only safety shoring. The subsurface soils and water levels found at the sedimentation basin generally matched the boring data. Thus, the boring data accurately represented the various soil types and dewatering requirements actually found at all locations plaintiff excavated within reasonable limits, with the exception of the oil/water separator site.

Defendant says that drawing M–6 is only an unscaled mechanical drawing which it intended to be nothing more than an aid in the design of the foundation underneath the oil/water separator upon which H.B. Mac imprudently relied for purposes of taking dimensions. In this regard, defendant says that a reasonably prudent contractor would have known that the sloped lines on this particular drawing, although showing sloped

---

**34.** Defendant's alternative argument seems to agree that, assuming the borings are fairly indicative of conditions at the site with respect to the likely presence of a thick layer of limestone, a reasonably prudent contractor would not have estimated use of sheet pile shoring the entire distance from ground level to the twenty foot level but only for the last four or five feet of

excavation within the sands and gavels shown in the borings below the limestone. Therefore, defendant's contention in this regard suggests that at least a partial recovery by plaintiff for its costs for installing sheet pile shoring might be proper, i.e., from ground level to a depth of fifteen or sixteen feet.

walls for the excavation, were not meant to provide any indication as to the type of excavation which should be used for the oil/water separator but to show that the top of the poured foundation had to meet undisturbed soil to effect a bonding between the two to keep the tank from floating. This explanation makes sense after-the-fact. It ignores the fact that the sloped lines shown on drawing M–6, whether or not drawn to scale and without dimensions, do suggest the sloped wall method of excavation which defendant clearly had in contemplation. The drawing left up to the contractor's discretion the determination of the degree of slope and the depth of the excavation. However, drawing M–6 is simply another indication upon which H.B. Mac reasonably relied, in concluding that a sloped excavation approach would be appropriate for the oil/water separator.

Further, the court finds that, based upon the substantial layer of limestone shown in the eight soil borings, H.B. Mac acted as a reasonably prudent contractor in concluding that it was likely, if not highly probable, that during excavation for the oil/water separator, it would encounter a thick layer of limestone that could be removed by a sloped wall excavation method, that such limestone would offer sufficient support for the walls of the excavation to allow excavation to the anticipated depth of sixteen feet, that the excavation could be effected using a ¾:1 slope ratio and that only aluminum safety shoring would be needed.

However, defendant charges that H.B. Mac was not prudent in calculating the depth of the excavation. Defendant points out that Detail 4 of Sheet M6 of PX 2 provided no vertical dimension for the depth of the tank because the size of the tank was within the contractor's control and actually applied to two separate tanks, the 15,000 gallon prefabricated steel tank to be installed at the oil/water separator site and the 500 gallon tank to be installed at the Maintenance Facility. Further, says defendant, the fifteen feet to sixteen feet depth plaintiff anticipated as needed for placement of the oil/water separator tank was the result of plaintiff's miscalculation of the size of tank needed. As PX 42 shows the 15,000 gallon tank required for

the washrack oil/water separator could have been either cylindrical or rectangular in shape although the specifications require that it be of factory fabricated steel or fiberglass, prepackaged, pre-engineered and ready to install when delivered. Thus, the capacity of the tank was specified but H.B. Mac had some degree of control over most of the tank's other specifications including its dimensions (length, width, and height). Plaintiff could have ordered a tank meeting the gallonage requirement that would not have needed a twenty foot excavation for placement but only 16 feet as plaintiff originally anticipated in its bid. Since the tank plaintiff selected was not six or seven feet in diameter but approximately nine feet in diameter, H.B. Mac's selection of the tank for this site, added another four feet to the depth of the excavation.

The evidence shows that plaintiff, in bidding this contract, either recognized or should have recognized, that the ground water level, as clearly shown in the soil borings, on average was at approximately twelve feet and that level varied between ten and fourteen feet below ground surface throughout the site because of precipitation, nearby streams, a tidal basin, and the Pacific Ocean being less than a mile from the oil/water separator site. It is true that this fluctuating ground water level provided no hinderance to plaintiff's successful excavation, using only safety shoring and little, if any, dewatering, of a twenty foot deep vertical trench even closer to the Ocean, by approximately two hundred yards, than was the oil/water separator site. Perhaps this excavation of the trench, which occurred prior to plaintiff's failed excavation efforts at the oil/water separator site, explains why plaintiff, during project performance, made no attempt to adjust its excavation plan for the oil/water separator. Even so, the court believes that a reasonably prudent contractor, under all of the circumstances here present, would have realized that below the sixteen foot level, using a sloped excavation and only safety shoring, would risk wall failure. Accordingly, such a contractor would have determined to use vertical sheet pile rather than safety shoring for the last four feet of the excavation. In sum, to this limited extent, based

upon the above factors including plaintiff's site visit and the indications contained in all of the contract documents, the court finds that plaintiff acted as a reasonably prudent contractor in interpreting the contract documents. *Foster Constr.,* 193 Ct.Cl. at 593, 435 F.2d at 875; *A.S. McGaughan Co. Inc. v. United States,* 24 Cl.Ct. 659 (1991), *aff'd,* 980 F.2d 744 (Fed.Cir.1992). Accordingly, plaintiff is entitled to recover the cost of installation of sheet pile shoring for the first sixteen feet of the excavation only.

### 3. The Contractor Must Have Reasonably Relied on the Indications of Subsurface or Latent Physical Conditions in the Contract.

■ Mr. Fisher, who prepared plaintiff's bid for the Ft. Shafter Project testified that based upon his extensive experience in bidding on approximately fifty Hawaiian contracts, he relied upon all of the contract documents in determining what subsurface conditions might be expected at the oil/water separator site and that he anticipated a dewatering system would be necessary for this site. Consequently, he testified that he included in H.B. Mac's bid the cost of two small pumps to remove surface water and rain water as well as a 580 backhoe to slope the excavation to a ¾:1 slope, as indicated in drawing M–6, to the pad elevation, a distance of approximately fifteen feet. Defendant attacks Mr. Fisher's assumptions respecting the nature of soils at the oil/water separator site, particularly Mr. Fisher's use of blow counts to determine the cohesiveness of the soils shown in the borings which were mostly sands and gavels. Defendant says that Mr. Fisher wrongly relied upon blow count data in determining whether to use a sloped excavation because, as its expert witnesses testified, blow counts, which measure the compactness or density of soils, should not be used to determine the cohesiveness of soils, i.e., how well they hold together.[35] As the court noted previously, based upon the borings, plaintiff reasonably anticipated that a significant quantity of limestone would be encountered at the oil/water separator site

which would provide support for a sloped excavation. Defendant attempts to fault H.B. Mac for not showing that it contacted local contractors about subsurface conditions it might encounter at the site.

A general understanding of local conditions as required under Clause 62 of the Contract would not have provided the type of subsurface data needed to accurately determine excavation methods or costs. Moreover, if the record revealed anything about the Project site's subsurface soil conditions, it is that each excavation area within the Project site is unique. In fact, all of the subsurface soils throughout the entire Project site have one main feature in common—i.e. they vary radically from point to point for a number of reasons including their degree of prior disturbance, their time and method of deposit, their depth, their proximity to the Pacific Ocean and to the streams flowing through the area and perhaps other variables. Mr. Fisher's testimony was convincing that he used estimating methods that are standard and customary in the industry. Defendant's argument to the contrary is without merit. Therefore, the court finds that plaintiff reasonably relied upon the contract documents, the site visit information, and all other commonly used indications for determining subsurface or latent physical conditions at the oil/water separator site to the extent discussed above.

### 4. The Subsurface or Latent Physical Conditions Encountered Within the Contract Site Area Must Have Differed Materially From the Conditions Indicated in the Same Contract Area.

■ The black, silty clay soil that H.B. Mac first encountered during excavation of the oil/water separator site at the 7 foot level, continued for at least another 5 or 6 feet until the excavation reached ground water at approximately the twelve to thirteen foot level. Apparently, this layer of soil extended beyond that depth. In any event, because of the soils' porosity and hydrostatic pressures, the water siphoned upward and caused the

---

**35.** A blow count or N-value is the non-bracketed figure shown in the second column in from the left hand side of each boring log on Sheet C–1. A two inch split spoon sampler is driven into the ground by a 140 foot hammer that drops 30 inches. The blow count is the number of times the sampler must be hit to drive it eighteen inches into the ground.

soil to become unstable. According to the testimony of Mr. Moore, this soil was visibly different from the sands and gravels reflected in the eight soil borings and uncovered at the other Project excavations. The evidence suggests that a lens of this unusual soil was uncovered at a higher level at the sedimentation basin where it posed no problem. Obviously, this black silty clay soil, when wet, was more unstable than the sands and gravels shown in the borings and found at the other excavations. The Army's Internal Memorandum of December 17, 1992 indicated that the sample of this soil which plaintiff gave it to test, was a soft grade silty clay material which the Army designated as CL–CH a soil classification not found in the borings. Defendant now contends that this was a misclassification and that the soil was actually no different than the sands and gavels shown in the borings. However, as plaintiff argues, Mr. Bjorken, the Army's geotechnical expert admitted that the ability of the soil at the oil/water separator site to hold water was significantly greater than the soils at the Maintenance Facility. This suggests that there was some degree of difference in the materials encountered at the oil/water separator site when compared to the other soils and limestone encountered at all other excavation sites at the Project. Mr. Bjorken also admitted that because of the presence of limestone at the Maintenance Facility, had the oil/water separator been located at that site, an almost vertical excavation could have been used and no sheet pile shoring would have been needed. (R. 667, 669–670.) [36]

Based upon plaintiff's evidence including the testimony of Messrs. Moore, Boyd and Bjorken, the court finds that the subsurface or latent physical conditions H.B. Mac encountered at the oil/water separator site differed materially from the conditions indicated in the contract documents for that location.[37]

## 5. The Actual Subsurface or Latent Physical Conditions Encountered Must Have Been Reasonably Unforeseeable.

■ Obviously some of the soils found at the site, the sands and gravels for example, were shown in the borings. From this fact defendant contends that enough of the materials shown in borings were found at the site to validate its alternative contention that the borings fairly represented subsurface conditions at the site. The court disagrees. Mr. Okada, one of defendant's experts, long after performing an analysis of the soil sample, changed his opinion about the proper classification of the soil sample taken from the site from a silty clay, or CL–CH classification, to a clay sand or SC classification. This second opinion was not formed after a reexamination of the same soil sample but from memory. Mr. Okada's testimony in this regard was not persuasive. In fact, none of the soils identified in the borings had a CL–CH classification.

In retrospect, it is undeniable that subsurface soils and materials in the Ft. Shafter Flats vary widely. In fact, the only way to be sure of actual subsurface conditions at any given location within the Flats, is through proper soil borings taken at that specific site. Observation of above ground conditions during a prebid site visit would not have provided a reasonable basis for comparing subsurface conditions at the Maintenance Facility with those at the oil/water separator site. A reasonably prudent contractor without specific boring data could not have predicted the type of shoring needed at the oil/water separator site. The black, porous silty clay soil

**36.** The evidence also shows that in view of the amount of limestone depicted in the borings, H.B. Mac acted reasonably in not anticipating the total absence of limestone at the oil/water separator site. Although it could be expected that the layer of limestone would vary in thickness from that shown in the soil borings, H.B. Mac clearly expected to encounter a substantial, even thick, layer of limestone, one which would impede the driving of sheet pile shoring, during excavation of the oil/water separator site. Thus, H.B. Mac relied upon the presence of that limestone layer to add support to the sloped walls of the excavation. The absence of a thick layer of limestone at the oil/water separator site also represented a materially different subsurface condition that H.B. Mac could not have reasonably foreseen from the borings.

**37.** Although plaintiff had soil borings taken at the site after backfilling which, according to Mr. Moore, indicated that sheet pile shoring would be needed for the excavation, the tested soil taken from one of the borings may have been substantially disturbed.

differed materially from the soils reflected in the borings. The court finds, therefore, that the presence of this black, silty clay soil and the absence of the limestone were not reasonably foreseeable based upon the limited soil boring data defendant provided for the Project. *See Foster and Williams Bros. Co.*, 193 Ct.Cl. at 593, 435 F.2d at 875. Defendant contends that, in any event, at and below ground water table, sheet pile shoring would be needed because both types of soil, whether properly classified as a CL–CH or CS, are so cohesionless that either would require sheet pile shoring below ground water table. As discussed above, this argument has validity only below the sixteen foot level.

**6. The Contractors Claimed Costs Must Be Shown to Be Solely Attributable to the Materially Different Subsurface or Latent Physical Conditions Within the Contract Site.**

After the CO's denial of plaintiff's properly submitted, certified claim seeking an equitable adjustment in the amount of $129,207, excluding CDA interest and attorney's fees, the government performed an audit verifying the accuracy of this amount. Thereafter, on September 19, 1992, the parties stipulated that, should plaintiff prevail on its claim, plaintiff would be entitled to recover this amount. Consequently, a ruling in plaintiff's favor on its equitable adjustment claim would entitle plaintiff to a judgment for that stipulated amount. Therefore, the court finds that with respect to the sixth indispensable element of a Type I differing site condition, plaintiff has met its burden of proof.

In sum, plaintiff has shown by a preponderance of the evidence the existence of all six proof requirements for a Type I differing site condition claim. The contract documents, including the eight boring logs supplied by the Army, affirmatively represented subsurface soil conditions throughout the Project site. Plaintiff reasonably relied upon the contract documents and their indications of subsurface conditions to the extent of its bid assumptions respecting the depth of excavation needed for the oil/water separator, i.e., that based upon H.B. Mac's estimate of the size of the tank needed to meet contract requirements, the excavation would only re-

quire a depth of sixteen feet. However, when H.B. Mac chose a larger tank that required an excavation depth of approximately twenty feet, it should have anticipated that sheet pile shoring would be needed for the last four feet. Thus, defendant's argument that plaintiff's reliance upon the boring data was unjustified is correct but *only* with respect to the additional four feet needed to accommodate the larger diameter tank plaintiff elected to install. Plaintiff's reliance upon the boring data was reasonable to sixteen-twentieths (or four-fifths) of the required excavation depth. It follows that plaintiff has proven that it acted as a reasonably prudent contractor in interpreting the contract documents with respect to that portion of its contract claim. This, however, does not necessarily mean that H.B. Mac is entitled to four-fifths of the costs associated with the equitable adjustment stipulated to by the parties, for it is unclear whether the cost distribution of excavating this differing site condition was uniform from a depth of zero feet to twenty feet or whether certain portions of the excavation and shoring processes were disproportionately costly.

### CONCLUSION

Defendant has completely failed to substantiate its counterclaims for fraud under the requisite burdens of proof. Accordingly, plaintiff shall recover its costs for defending against the government's four counterclaims for fraud. Based upon the foregoing analysis, the court finds that a portion of plaintiff's claim for an equitable adjustment has merit, i.e., the costs of installing sheet pile shoring to the sixteen foot level at the twenty foot oil/water separator site excavation. Accordingly, the parties shall attempt to agree on the proper amount of damages plaintiff is entitled to recover under its Type I differing site condition claim, i.e., for the installation of sheet pile shoring to the sixteen foot level. The parties shall file a joint status report on these discussions within 30 days. Finally, each party shall bear its own costs for the contract claim.

**IT IS SO ORDERED.**